SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
RICHARD J. SIMMONS, Cal. Bar No. 72666
rsimmons@sheppardmullin.com
DANIEL J. McQUEEN, Cal. Bar No. 217498
dmcqueen@sheppardmullin.com
TYLER J. JOHNSON, Cal. Bar No. 307386
tjjohnson@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone:  213.620.1780
Facsimile:   213.620.1398

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
KEAHN N. MORRIS, Cal. Bar No. 273013
kmorris@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:  415.434.9100
Facsimile:   415.434.3947

Attorneys for Respondent
DIGNITY HEALTH

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| VERONICA FLORES, an individual,<br><br>              Petitioner,<br><br>       v.<br><br>DIGNITY HEALTH, a California corporation, and DOES 1 through 5, Inclusive,<br><br>              Respondents. | Case No. 2:18-cv-02471-JFW(AGRx)<br><br>**RESPONDENT DIGNITY HEALTH'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS AMENDED PETITION**<br><br>Date:      March 30, 2020<br>Time:      1:30 p.m.<br>Judge:     John F. Walter<br>Crtrm:     7A<br><br>[Filed concurrently with:  Notice of Motion; Memorandum of Points and Authorities; and [Proposed] Order] |

00001

-1-

1    Respondent Dignity Health hereby requests the Court take judicial notice of
2    the following documents pursuant to Federal Rule of Evidence 201 ("FRE 201") in
3    ruling on Dignity Health's Motion to Dismiss:
4         1.    The October 31, 2019 decision of Administrative Law Judge Deena
5    Ghaly revoking Petitioner Flores' nursing license, a true and correct copy of which
6    is attached hereto as **Exhibit A**;
7         2.    The California Court of Appeal's opinion in <u>Veronica Flores v. Dignity</u>
8    <u>Health</u>, 2d Civil No. B294776, a true and correct copy of which is attached hereto as
9    **Exhibit B**.
10   Federal Rule of Evidence 201(b) provides that a court may take judicial
11   notice of a fact "not subject to reasonable dispute" because it is either (1) generally
12   known within the territorial jurisdiction of the trial court or (2) capable of accurate
13   and ready determination by resort to sources whose accuracy cannot be reasonably
14   questioned.
15   The Court may take judicial notice of **Exhibit A** pursuant to FRE 201 because
16   "[c]ourts may take judicial notice of some public records, including the records and
17   reports of administrative bodies." <u>See</u> <u>United States v. Ritchie</u>, 342 F.3d 903, 907–
18   09 (9th Cir. 2003).  The Court may take judicial notice of **Exhibit B** pursuant to
19   FRE 201 because the Court may take judicial notice of records from other courts.
20   <u>See Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank</u>, 136 F.3d 1360,
21   1364 (9th Cir. 1998) (taking judicial notice of court filings in a state court case
22   where the same plaintiff asserted similar and related claims).
23
24
25
26
27
28

00002

1  Dated:  February 26, 2020

2                          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

3

4                          By    _____
                                        /s/ TYLER J. JOHNSON
5                                       RICHARD J. SIMMONS
6                                       DANIEL J. McQUEEN
                                        KEAHN N. MORRIS
7                                       TYLER J. JOHNSON

8
                                 Attorneys for Respondent
9                                DIGNITY HEALTH

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMRH:4851-3023-6595.1       RESPONDENT'S REQUEST FOR JUDICIAL NOTICE ISO MOTION TO DISMISS

# EXHIBIT A

## DECLARATION OF SERVICE BY MAIL

I, Nataliya Yakuta declare:  I am over eighteen years of age and not a party to the within cause.  I am employed in the county where the mailing took place.  My business address is 1747 N. Market Boulevard, Suite 150, Sacramento, CA 95834.  On the date of execution of this declaration, I mailed from Sacramento, California the following documents:

[Decision and Order, dated October 31, 2019]

I served the documents by enclosing them in an envelope and placing the envelope for collection and mailing following our ordinary business practices.  I am readily familiar with the Board of Registered Nursing's practice for collecting and processing correspondence for mailing with the United States Postal Service.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

The envelope was addressed and mailed, via registered mail with return receipt requested, as follows:

**Veronica Flores**
**1651 Florentina Drive**
**Oxnard, CA 93030**

Receipt No.   **70170530000074565752**

I declare, under penalty of perjury under the the foregoing is true and correct.

[October 31, 2019]

Nataliya Yakuta, Enforcement Program



## DECLARATION OF SERVICE BY MAIL

I, Nataliya Yakuta declare:  I am over eighteen years of age and not a party to the within cause.  I am employed in the county where the mailing took place.  My business address is 1747 N. Market Boulevard, Suite 150, Sacramento, CA 95834.  On the date of execution of this declaration, I mailed from Sacramento, California the following documents:

[Decision and Order, dated October 31, 2019]

I served the documents by enclosing them in an envelope and placing the envelope for collection and mailing following our ordinary business practices. I am readily familiar with the Board of Registered Nursing's practice for collecting and processing correspondence for mailing with the United States Postal Service.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

The envelope was addressed and mailed, via registered mail with return receipt requested, as follows:

**Samuel F. Galici, Esq.**
**Law Office of Samuel F. Galici**
**2945 Townsgate Road, Suite 200**
**Westlake Village, CA 91361**

Receipt No.   **70170530000074565769**

I declare, under penalty of perjury under the the foregoing is true and correct.

[October 31, 2019]

Nataliya Yakuta, Enforcement Program





STATE OF CALIFORNIA

DEPARTMENT OF CONSUMER AFFAIRS

BUSINESS, CONSUMER SERVICES, AND HOUSING AGENCY • GAVIN NEWSOM, GOVERNOR

**BOARD OF REGISTERED NURSING**
PO Box 944210, Sacramento, CA  94244-2100
P (916) 322-3350  F (916) 574-8637  |  www.rn.ca.gov



October 31, 2019

Veronica Flores
1651 Florentina Drive
Oxnard, CA 93030

Dear Veronica Flores:

The enclosed Decision and Order with the Board of Registered Nursing is effective **November 27, 2019.** Please reference this Decision and Order and the other enclosures should you have any questions regarding this matter.

We wish you well in your future endeavors.

Sincerely,


Board of Registered Nursing
BRNENFORCEMENTEMAIL@DCA.CA.GOV

Encl:    Copy of Board Decision
         Form BRN 925
         Government Code 11521

cc:      Deena R. Ghaly, Administrative Law Judge
         Morgan Malek, Deputy Attorney General
         Samuel F. Galici, Esq.

BEFORE THE
BOARD OF REGISTERED NURSING
DEPARTMENT OF CONSUMER AFFAIRS
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Accusation Against: | Case No. 2018-651 |
| **VERONICA FLORES** | OAH No. 2018070860 |
| **Registered Nurse License No. 670536** | |
| Respondent. | |

## DECISION

The attached Decision and Order of the Administrative Law Judge is hereby adopted by the Board of Registered Nursing as its Decision in the above-entitled matter.

This Decision shall become effective on **November 27, 2019.**

IT IS SO ORDERED this **31st** day of **October 2019.**


Michael Jackson, President
Board of Registered Nursing
Department of Consumer Affairs
State of California

# BEFORE THE
# BOARD OF REGISTERED NURSING
# DEPARMENT OF CONSUMER AFFAIRS
# STATE OF CALIFORNIA

## In the Matter of the Accusation against:

## VERONICA FLORES, Respondent

## Registered Nurse License Number 670536

## Agency No. 2018-651

## OAH No. 2018070860

## PROPOSED DECISION

Deena R. Ghaly, Administrative Law Judge, Office of Administrative Hearings (OAH), State of California, heard this matter on February 4 through 8, 2019, and April 25 and 26, 2019, in Los Angeles, California

Deputy Attorney General Morgan Malek represented complainant Joseph L. Morris, Ph.D., M.S.N, R.N., Executive Officer of the Board of Registered Nursing (Board). Attorney Samuel F. Galici represented Veronica Flores (respondent), who was present throughout the hearing. Oral and documentary evidence was received. The record was kept open for post-hearing closing statements, with final submissions due July 26, 2019, when the record was closed and the matter deemed submitted.

## Pending and Post-Hearing Motions

In post-hearing submissions, respondent moved to augment the record to admit a document generated by an automatic medication-dispensing machine, Omnicell, which reflects medications dispensed under the password of a nurse alleged to have been supervised by respondent, Wendy Tumbleson. The document has been marked for identification as Exhibit R-19.[1] Respondent's motion to have the document admitted was unopposed and is granted. Exhibit R-19 is admitted into evidence.

During the hearing and again in post-hearing submissions, respondent objected to the introduction of one page of Exhibit C-4,[2] page 392. Page 392 is the Omnicell report reflecting medications dispensed under respondent's password. The objection was taken under submission and reviewed in the course of preparing the proposed decision. For the reasons set out in Factual Finding 19 below, the objection is overruled and page 392 is admitted as part of Exhibit C-4.

In post-hearing submissions, complainant moved to augment the record to admit three declarations marked for identifications as Exhibits C-18, C-19, and C-20. Respondent opposed the motion. As set out in footnote 3 below, the motion is denied and the exhibits are excluded.

---

[1] Both parties used numbers to pre-mark their respective exhibits. To avoid confusion, respondent's exhibits are referred to by the letter "R" followed by a number and complainant's exhibits are referred to by the letter "C" followed by a number.

[2] With the exception of page 392, Exhibit C-4 was admitted during the hearing.

00010

# SUMMARY

Complainant brought an accusation seeking to discipline respondent's license for gross negligence, illegally obtaining and possessing controlled substances, making incorrect entries in medical records, and using controlled substances in a dangerous manner. While the weight of the evidence did not sufficiently establish that respondent administered a medication at an accelerated rate, thereby endangering the patient, as alleged in the first cause of discipline in the accusation, clear and convincing evidence established the balance of the allegations.

Applying the Board's mandate to protect the public, its disciplinary guidelines, and its criteria for rehabilitation to the factual findings, the only disposition consistent with these standards is revocation of respondent's license. The evidence established that respondent was impaired while on duty, diverted drugs, and compromised patient care. This extremely serious misconduct is inconsistent with the responsibilities of a registered nurse. Because she expressed no remorse or any other indicia of accountability, even granting a restricted license to her would not sufficiently protect the public.

# FACTUAL FINDINGS

## Parties and Jurisdiction

1.      On December 8, 2005, the Board issued Registered Nurse License Number 670536 to respondent. The Registered Nurse License was in force at the times relevant to this matter and is scheduled to expire on November 30, 2019.

3

2.    Complainant brought the Accusation in his official capacity. Respondent timely filed a Notice of Defense and this matter ensued.

## Complaints to Board

3.    A.    In 2014, respondent was employed by Saint John's Medical Center (SJMC) as a registered nurse in SJMC's emergency department.

B.    In April 2014, SJMC submitted a complaint to the Board stating that, on April 1, 2014, respondent made a series of medication errors in the course of her work in the Emergency Department, appeared lethargic and forgetful while on duty, and improperly removed controlled substances from the Omnicell machine. In March 2015, SJMC submitted a second complaint to the Board stating that, on December 31, 2014, while on duty, respondent exhibited signs of impairment including slurred speech, making exaggeratedly deliberate movements, and entering unintelligible documentation into patient records. She also seemed to be unable to complete basic tasks, such as logging into a computer station.

C.    This matter arose from SJMC's complaints and the resulting investigations undertaken by the Board.

## Complainant's Evidence

### EVENTS OF APRIL 1, 2014

#### Staff Testimony

4.    A.    Joan Welborn (Welborn) has been an emergency room nurse at SJMC for over 30 years and worked with respondent since 2010. On April 1, 2014, Welborn was on duty with respondent. Welborn testified during the hearing and

4

stated that she observed respondent in a state of lethargy that morning, slurring her speech, and responding to questions in an unusually slow manner. Welborn recalled other nurses working with them noting respondent's behavior and commenting that she might be "stoned."

      B.     Later, Welborn overheard a doctor reminding respondent to take the vital signs of a critically ill patient and respondent replying that she was waiting for the patient to awaken; Welborn stated:

> A     I was the triage nurse that day. So that means I'm walking in and out frequently that day. So I happened to be walking by, and I noticed that one of the doctors had spoken to [respondent] and asked her to be getting vital signs on her patient, and that she had responded, you know, that the patient was sleeping and that she didn't want to wake the patient.
>
> And I know that Dr. Goldberg had said, you know, "this is a very sick patient, and I'm worried about her being in septic shock."
>
> Q.    Why was that significant to you, Ms. Welborn?
>
> A     Well, it's not normal for the doctors to ask us to get vital signs on our patient. When you have somebody that is that ill, you have to be in there frequently checking on them and making sure things are all right.

(Transcript, Vol. I, p. 41.)

00013

C.      Welborn also noted that respondent's charting that day was exceptionally unclear. Toward the end of Welborn's shift, at approximately 6:00 p.m., she handed a patient label to managing nurse, Sheri Sterling (Sterling), and recommended that Sterling review the charting notes for that patient.

D.      Welborn wrote a statement regarding what she had witnessed on April 1, 2014, which was consistent with her testimony at the hearing. The statement (Exh. C-4, pp. 131-132) is dated April 14, 2013, which would be before the alleged incident. Asked about the date during the hearing, Welborn stated that it was a mistake and that she intended to write '2014.' (Transcript, Vol. I, p. 39.)

E.      Welborn stated that, through the course of the years they had worked together, she found respondent to be intimidating and confrontational and so was reluctant to report her behavior to management. Nonetheless, she brought the matter to Sterling's attention "[b]ecause you don't want somebody taking care of you who might not be in their full capacity or capabilities at that time." (Transcript, Vol. I, p. 43.)

5.      A.      Paul Wilcox (Wilcox) has been a registered nurse with SJMC for 19 years. He was the charge nurse (i.e, the nurse responsible for making assignments and overseeing nurses' work) on April 1, 2014. Wilcox testified at the hearing, stating that respondent appeared very tired that day as well as disoriented and confused. For instance, she could not recall whether she had inserted an IV and drawn blood from a particular patient. Wilcox recalled telling Welborn that he believed respondent was "stoned," meaning, under the influence of muscle relaxers or pain medication or that possibly, she was exhausted.

6

B.     Wilcox had concerns about patient safety as he watched respondent work that day but did not wish to "rock the boat," (Transcript, Vol. I, p. 65) and hoped that he and Welborn could handle the situation on their own. However, once Welborn brought the issue to management, Wilcox was interviewed by management as well and directed to write a statement about the day's events. The statement Wilcox prepared is consistent with his testimony. (See Exh. C-4, p. 135.)

C.     At SJMC, temporary or "travelling" nurses are assigned a regularly employed nurse to guide and review their work. The regularly employed nurse is referred to as the 'preceptor' and the travelling nurse is the 'preceptee." One of the factual disputes in this matter is whether respondent was serving as a preceptor on April 1, 2014, for traveling nurse Wendy Tumbleson (Tumbleson). If so, this raises the question of whether she would have directly cared for patients that day. Wilcox did not recall whether respondent served as a preceptor on April 1, 2014. Asked whether, as a general rule, nurses do not directly care for patients when they serve as preceptors, Wilcox replied, "a preceptor is responsible for the patient still, but the preceptee does the work. But the preceptor is to take the responsibility, is my understanding. And then the charge nurse is taking responsibility beyond that." (Transcript, Vol. I, p. 70.)

6.     Tumbleson did not testify at the hearing. She signed a declaration introduced in the record, which provided the following:

1.     I am a registered Nurse licensed by State of California and Indiana.

2.     On April 1, 2014, I was a contract registered nurse with Dignity Health (St. John's Hospital) in Ventura,

7

00015

California. I was assigned to Preceptor Veronica Flores and I was the Preceptee on April 1, 2014.

3.      I have reviewed the attached nursing notes for patient #1191394 dated April 1, 2014. I prepared the attached two pages in the patient's nursing notes. My signature is at the bottom of the second page.

4.      On April 1, 2014, at 1712 hours, I noted in the nursing notes: Vancomycin 1 gm/200 ml started over 90 minutes, meaning Vancomycin to be infused over 90 minutes.

5.      On or about April 1, 2014, I spoke to Sheri Sterling. She asked me about Preceptor [respondent]. I voiced concerns about the inconsistency in preceptorship with myself. I also mentioned to Sheri Sterling that I had noted that [respondent] had miss programmed (sic) an infusion pump in (sic) which I was able to correct.

6.      Further on April 1, 2014, Paul Wilcox, RN, was covering [respondent] and my patients while we went to lunch. Upon our return, Paul Wilcox notified us that an antibiotic was infusing on a patient; however, that antibiotic was not documented in the patient's chart.

7.      I also provided a written statement on April 1, 2014 wherein I wrote "On my first day of orientation, it was a crazy day. [Respondent] was orienting me. There were

8

occasions where I had to acquire information from other
nurses. I could not find [respondent]. She was gone a lot
and never mentioned to me where she was going, she
would just leave."

(Exh. C-8, pp. 4 & 5.)

7.    A.    Marissa Serra, also known as Marissa Roberts (Serra) is a
registered nurse with 12 years' experience. She has spent her entire professional career
at SJMC and has known, and worked with, respondent for approximately seven of
those years. Serra worked with respondent on April 1, 2014.

B.    Serra testified at the hearing and stated that, based on her
observations on April 1, 2014, she concluded there was a high probability of
respondent being under the influence of drugs then. Respondent seemed distracted
and unfocused. In one instance, respondent walked into the room of one of Serra's
patients, apparently confused about where she was. In particular, Serra recalled
becoming alarmed when, as had Welborn, Serra overheard Dr. Greenberg reminding
respondent to take a critically ill patient's vital signs and respondent replying that she
was waiting for the patient to awaken. Asked about the relevance of that exchange,
Serra stated:

There should be current ones in the chart anyway, and you
don't need to wake a patient up to get their vital signs.
Critical patients are normally on a continuous cardiac
monitor, have a blood pressure cuff already on, have an
oxygen monitor that –all their pulse, everything. You pretty
much just have to look at the screen, and you don't even

9

have to wake the patient up, unless they wake up when the

blood pressure cuff is cycling.

(Transcript, Vol. II, p. 75.)

## Management Observations

8.      A.      Sterling was the SJMC's emergency department manager in 2014. She has been a registered nurse for approximately 20 years. Sterling testified at the hearing and stated that on April 1, she had a brief encounter with respondent at about 10 in the morning about respondent's continuing education requirements. Sterling did not observe that respondent appeared slow or sleepy. On the contrary, respondent was very combative and aggressive.

B.      Toward the end of the day, at approximately 6 p.m., after Welborn gave Sterling the patient label, Sterling called in Tumbleson and asked her about respondent that day. Tumbleson reported to Sterling that she had witnessed respondent infusing a patient with an antibiotic, Vancomycin, at twice the prescribed rate, a potentially dangerous practice.

C.      Sterling stated that, on April 1, 2014, respondent served as Tumbleson's preceptor and that, as such, respondent would not have directly treated patients.

D.      In response to the information she received about respondent from Welborn and Tumbleson, Sterling requested assistance from senior management and then reviewed respondent's charting for the day. Sterling found respondent's charting minimal, filled with spelling and grammar errors, and with entire indecipherable sentences.

10

E.      Sterling then directed hospital pharmacy personnel to generate a report of the medications dispensed from Omnicell under respondent's password. Once she received respondent's Omnicell report, Sterling noted certain irregularities in the records of drugs dispensed: (i) a narcotic and an antiemetic (anti-nausea medication) were dispensed together but administered at two separate times, an aberration from normal practice; (ii) narcotics had been dispensed and then, apparently, wasted (destroyed) throughout the day; (iii) narcotics had been dispensed in greater doses than ordered; and (iv) narcotics had been dispensed without orders.

F.      Sterling next contacted the nursing supervisor on duty that day, Debra Gualtieri (Gualtieri), a registered nurse for over 40 years and an employee at SJMC for 30 years. Gualtieri has been serving in various administrative capacities at SJMC for the past 15 years. She recalled meeting with Sterling late in the day: "It may have been 6:00, 6:30 [p.m.]– something like that." (Transcript, Vol. IV, p. 8.)

G.      Gualtieri and Sterling met in Sterling's office and called respondent in to discuss the complaints against her. Respondent requested that she be accompanied by a colleague, Tamara Shexnayder (Shexnayder).

H.      At the meeting in her office, Sterling found respondent's attitude to be hostile and defensive and respondent's voice raised; however, Sterling did not find that respondent appeared to be impaired. Nevertheless, after asking respondent a few questions, Sterling and Gualtieri completed a Supervisor's Reasonable Suspicion Report, the first step of the employee drug testing protocol. On the form, Sterling noted that respondent did not exhibit any outward signs of intoxication and that the request for testing was based on "quality of care issues." (Exh. C-4, p. 147.)

11

Case 2:18-cv-02471-JFW-AGR   Document 84   Filed 02/26/20   Page 20 of 99   Page ID #:942

I.        Sterling placed respondent on suspended status, pending investigation and directed her to report for drug testing. Respondent asked to finish her patient documentation before leaving the hospital. Because respondent had been placed on suspended status, Sterling did not permit her to do any additional work. Security staff escorted respondent to HealthWorks, an outside contractor SJMC used for drug testing its employees or perspective employees; however, prior to leaving the hospital, respondent went to retrieve her belongings and stopped in the bathroom in the hospital. Regarding the period of time respondent spent before departing for the drug-testing facility, Gualtieri stated: "So we had asked security to take [respondent] . . . for the drug testing, and she said she needed to get her purse. But then I found out she was - - it was taking a long time. So I went to check to see what was going on, and security had allowed her to go into the bathroom by herself." (Transcript, Vol. I, p. 199.)

J.        At the hearing, Sterling was asked why she would send respondent for drug testing if she did not appear impaired:

> Q: What would be the point of sending her for a urine test after you observe that she had no signs of impairment?
>
> A: Because earlier in the day, it was reported by her colleagues that she was impaired.
>
> Q: What would you expect to see in a report, if it was 11 hours later and she didn't appear to be impaired:
>
> A: I would expect to see positive drug results in her urine.
>
> Q: And it concerned you that she had positive drugs in her urine, even though she had prescriptions for those drugs:

12

I.        Sterling placed respondent on suspended status, pending investigation and directed her to report for drug testing. Respondent asked to finish her patient documentation before leaving the hospital. Because respondent had been placed on suspended status, Sterling did not permit her to do any additional work. Security staff escorted respondent to HealthWorks, an outside contractor SJMC used for drug testing its employees or perspective employees; however, prior to leaving the hospital, respondent went to retrieve her belongings and stopped in the bathroom in the hospital. Regarding the period of time respondent spent before departing for the drug-testing facility, Gualtieri stated: "So we had asked security to take [respondent] . . . for the drug testing, and she said she needed to get her purse. But then I found out she was - - it was taking a long time. So I went to check to see what was going on, and security had allowed her to go into the bathroom by herself." (Transcript, Vol. I, p. 199.)

J.        At the hearing, Sterling was asked why she would send respondent for drug testing if she did not appear impaired:

> Q: What would be the point of sending her for a urine test after you observe that she had no signs of impairment?
>
> A: Because earlier in the day, it was reported by her colleagues that she was impaired.
>
> Q: What would you expect to see in a report, if it was 11 hours later and she didn't appear to be impaired:
>
> A: I would expect to see positive drug results in her urine.
>
> Q: And it concerned you that she had positive drugs in her urine, even though she had prescriptions for those drugs:

12

A: Absolutely. Just because you have a prescription for
those medications doesn't mean that it's safe for you to
perform nursing tasks under the influence of those
medications. It's kind of like drinking alcohol the night
before. You still can't come to work under the influence.

(Transcript, Vol. I, pp. 125-6.)

K.      Test results from April 1, 2014 revealed that respondent's urine
contained benzodiazepine at the concentration level of 317 mg/ml (milligrams per
milliliter). (C-Exh. 10, p. 14-6.)

## Events of December 31, 2014

### STAFF OBSERVATIONS

9.      A.      Lara Roberts (Roberts) has been a registered nurse for 23 years
and is employed at SJMC, where she has worked for the last 10 or 11 years. Roberts
worked with respondent at SJMC throughout Roberts' tenure there and was the
charge nurse on December 31, 2014.

B.      Roberts testified at the hearing and stated that she recalled
respondent appearing sleepy, moving slowly, and unable to log into her computer
because she was inputting her password into the username portion of the login page.
At the request of her supervisor, Roberts prepared a handwritten chronology of that
day's events. According to the notes, Roberts observed respondent struggling to log
into her computer beginning at 10:10 a.m. and successfully log in at 10:35 a.m. The
notes also reflect that respondent resumed charting at 11:00 a.m. and that Roberts
directed respondent to take a break at 11:20 a.m. (See Exh. C-5, p. 57.)

13

C.     After noting respondent's continued lethargy and odd behavior, Roberts reviewed respondent's charting and found it unintelligible and incomplete. A patient chart entry time-stamped 11:13 a.m. documented the patient's chief complaint as "recontsact wit pt. report to RN shanna aft6er bACK from WIH OTHER PT. (Exh. C-5, p. 66.) A patient chart entry time stamped 11:10 a.m. documented the patient's chief complaint as "ED: 0720 initial contact with pt, vss nad. c/o seval days with coulgh non-productin=ve. Pt jere with weqneww. Pt received report from NOV=C RN jerry and poklaced on monitrior. Pt dnie acute distress at thid time, repositioned for comort." (Exh. C-5, p. 67).

10.     Debbie Diaz Vega (Vega) is a clinical technician at SJMC, where she has worked for 14 years. Vega testified and stated that in 2014, she worked with respondent and had observed respondent on a number of occasions when her behavior seemed unusual. Particularly, with respect to December 31, 2014, Vega stated she saw respondent at the computer, eyes glazed, looking very sleepy, blinking slowly, moving slowly, and seemingly unable to focus. "Just slow to blink. Just a slow, long blink." (Transcript, Vol. I, p. 184.)

11.     Jamie McDowell (McDowell) has been a licensed technician since 2006. In 2014, she worked with respondent in SJMC's emergency department. McDowell observed respondent on both April 1, 2014 and December 31, 2104. On April 1, 2014, McDowell observed that respondent's handwriting on a vial of blood was illegible. On December 31, 2014, she observed respondent looking tired, delayed in her actions, and having difficulty logging into her computer.

14

## Management Observations

12.    A.    JaneAnne Morgan (Morgan) is a registered nurse. She also holds a master's degree in business administration and is currently director of the emergency department at West Hill Hospital. In 2014, Morgan was the emergency department director at SJMC where she oversaw department operations and managed day-to-day personnel matters.

B.    Morgan testified at the hearing and stated that she was on duty on December 31, 2014. Morgan received several complaints about respondent's behavior that day. Morgan called a member of SJMC's human resources team, Angelita Meza (Meza) and the nurses' union president, Nina Wells (Wells) as well as respondent regarding the complaints. Morgan recalled respondent initially stating that she did not take any medications and then stating that she did take medication and her last dose had been somewhere between 8:00 p.m. and 10:00 p.m. the night before. Both Morgan and Meza observed respondent so sleepy at the meeting that she appeared to doze off and her arm slipped off the armrest of the chair in which she was seated.

C.    After the disciplinary meeting in Morgan's office, respondent was directed to submit to employee drug testing. Morgan and Meza stated that respondent attempted to delay leaving for the facility where employees are tested, asking to retrieve her things and to use the bathroom. Though she was instructed to proceed directly to the lab, respondent went to the bathroom and stayed there several minutes.

13.    Results of the drug tests administered to respondent on December 31, 2014, revealed that respondent's urine tested positive for the metabolites (byproducts) of benzodiazepines. Specifically, respondent's urine contained levels of the

15

metabolites of hydromorphone, nordazepam, quezepam, and temazepam, indicating recent usage.

### ADDITIONAL EVIDENCE

14.    A.    Complainant introduced the Omnicell report reflecting medications dispensed and, in some instances, wasted under respondent's password on April 1, 2014. The names of the patients are redacted on the report and medical record numbers (MRN) have been interlineated into the document through handwritten notations.

B.    Comparing the entries in the Omnicell report to the patient records bearing the same MRN as marked on the report show late wasting (destruction); dispensing of five milligrams of hydromorphone without a doctor's order and wasting two of the five; dispensing and wasting 10 milligrams of Vicodin without a doctor's order, and dispensing two milligrams of Ativan in excess of doctor's orders, later wasted. Transactions of particular note were withdrawals of Dilaudid for Patient Number 0321924, which were neither documented as administered or wasted, and multiple withdrawals of Dilaudid for Patient Number 1136316, also not documented as administered or wasted. (See Exh. C-4, p. 392.)

15.    A.    Dr. Richard Carvotta (Carvotta) and Cynthia Farner (Farner) presented evidence to authenticate the Omnicell report. Carvotta has been a pharmacist for 47 years and was employed at SJMC's director of pharmacy from 2006 to 2017. Carvotta testified and stated that he or his staff have been trained to run reports from the Omnicell system and routinely regularly do so as part of their usual duties, though the data is generated from the Omnicell system. He further stated that

16

all data, including date and time of transactions is generated by the Omnicell system. (See Transcript, Vol. III, p. 118.)

        B.    Carvotta was asked about the interlineations of MRN numbers handwritten on the document:

        Q    And are you familiar with redacting patients' names on an Onmicell report and substituting it with an MRN?

        A    It's not a substitution. What it is is when we're trying to determine if a particular drug was ordered for a patient and administered to a patient, the only way that we can determine that is by looking at the medical record so we can't just go by the patient's name.

        We don't file medical records by patient names; we file them by numbers. So these numbers identify the patient's medical record, and then from there, an audit is done, whatever the visit time was for that patient on that day.

(Transcript, Vol. III, p. 89.)

Asked why the MRN numbers are not part of the information generated when the Omnicell report is run, Carvotta stated that the Omnicell software is only set up to identify patients by name, not MRNs.

        16.    A.    Cynthia Farner (Farner), an employee of SJMC's Risk and Quality Department, is responsible for addressing patient complaints and other issues related to SJMC's liability, a position she has held for 30 years. Responding to requests for

00025

documents in the course of litigation, including pursuant to a subpoena, is part of her usual duties.

      B.    Farner testified at the hearing and stated she had filled in the MRN numbers in the Omnicell record at issue. When compared, the patient records, which include physicians' orders for medications and nurses' notes regarding administering the medications, should match the medications accessed by the nurses from the Omnicell. If medications are dispensed without orders, the transactions are investigated.

      C.    Farner stated that preparing the interlineations of MNR numbers onto Omnicell reports was a routine part of her work, that she performs this task by accessing the electronic patient records in SJMC's data base, and writing in the MRN from there onto the Omnicell report. Thereafter, she redacts the patient name from the Omnicell report so that the individual transactions on the Omnicell report are identified by MRN only.

      D.    Asked specifically how Farner determined which MRN number to write into the Omnicell record at issue, Farner responded: "It's just going back and forth. I look at the Omnicell page. I go into the electronic health record, pull up the name, compare the numbers, compare the dates of service." (Transcript, Vol. VII, p. 87.)

## Respondent's Arguments Regarding Printed Patient Records and the Omnicell Report

18.    A.    Paper printouts of the patient records Farber used to interlineate the Omnicell report are included in Exhibit C-4 at pp. 168-390. Exhibit C-4 was admitted into the record as administrative hearsay, with the exception of statements

attributed to the Board's investigator. Those statements were admitted as direct evidence pursuant to *Lake v. Reed* (1997) 16 Cal.4th 448.

        B.    As noted above, respondent objected during and after the hearing to admitting the Omnicell report as part of Exhibit C-4. The objection was taken under submission and is addressed here.

        C.    Both the patient records and the Omnicell report had the patient names redacted. Complainant relied on the MNR numbers interlineated by Farber in the Omnicell report to demonstrate that the medications dispensed under respondent's password correlated to the patient records or more specifically, to the patients themselves who, in turn, are only identified by MNR numbers in the records.[3]

        D.    In post-hearing submissions, respondent argued that both the printed patient records and the Omnicell report were not the strongest evidence available for establishing whether there was medication dispensed and wasted under respondent's password and whether she had operated the Omnicell. According to respondent, pursuant to Evidence Code section 412, the report should be "viewed with distrust." (Evid. Code, § 412.) Respondent's argument continued as follows:

---

[3] From the outset of this matter, respondent argued at various times that, unless the names of the patients could be revealed, both the Omnicell report and the printouts of the patient records were unreliable and should be excluded. Complainant argued that revealing the names would violate federal privacy law and that the only circumstance in which the names could or should be revealed is if the ALJ would review them in camera and outside the presence of the parties or their counsel (or anyone else). In pre-hearing rulings, this ALJ declined to do so.

It is for good reason that the law requires that the weaker

evidence be distrusted when stronger evidence could have

been produced if it existed. The only way to know whether

or not the printout differs from [the] document's

appearance on the monitor is to inspect the computer and

printer. Everyone who testified on the point agreed that the

appearance of the printouts are not how the medical

records appear on the monitor. It is necessary for Ms. Flores

to bring in an IT tech to examine the computer and printer

and see for sure. The same is true with respect to the

Kafkaesque Omnicell report. Its authenticity can only be

determined by having an independent expert examine the

Omnicell, printout the report and determine whether there

have been alterations in the report since the time of

dispensing at issue.

(Respondent's Closing Statement, p. 11.)

E.     Further, respondent contended that, in 2007, Farber directed her
to lie in litigation to protect the hospital. As such, respondent argued that Farner was a
biased witness and her testimony authenticating the interlineations on the document
did not satisfy the reliability element necessary to admit the document under Evidence
Code section 1271's business record exception.

## Analysis of Respondent's Arguments

19.     A.     Disciplinary proceedings conducted under the Nursing Practices
Act, as is this matter, are governed by the Administrative Procedure Act (APA), codified

20

at Government Code section 11500 et. seq. (Bus. & Prof. Code, § 1250.) The APA expressly provides that hearings "need not be conducted in accordance with the technical rules of evidence" (Gov. Code, § 11513) though it is common practice to look to the Evidence Code for reference and guidance. Here, even under the Evidence Code's provisions, respondent's arguments challenging the printouts of patient records, the Omnicell report, and the interlineations on the Omnicell report, cannot succeed.

B.      Software-generated writings such as the Omnicell reports do not require authentication beyond the testimony of knowledgeable operators. (See *People v. Rodgriguez, III* (2017) 16 Cal.App.5th 355 [relevant portions of this decision were certified for publication].) Here, Carvotta testified that he was familiar with the Omnicell machinery and that he and his staff were trained to run reports from it. (Factual Finding 16.)

C.      Evidence Code section 1552 provides:

A printed representation of computer information or a computer program is presumed to be an accurate representation of the computer information or computer program that it purports to represent. . . If a party to an action introduces evidence that a printed representation of computer information or computer program is inaccurate or unreliable, the party introducing the printed representation into evidence has the burden of proving, by a preponderance of the evidence, that the printed representation is an accurate representation of the

21

existence and content of the computer information or
computer program that it purports to be.

Respondent disputed the authenticity of the patient records during her testimony,
maintaining that the printouts had erroneous information regarding treating doctors,
room numbers, and dates of treatment. Complainant produced countering evidence
that more than met the preponderance burden for demonstrating the opposite,
including evidence of the doctors' identity and specialty, testimony that the hospital
rooms in the records were indeed available for patient use, and that the dates
identified by respondent reflected when the documents were printed, not when
treatment occurred.

        D.      Respondent's evidence challenging the authenticity of the
Omnicell report relied, somewhat circuitously, on introducing another Omnicell report,
this one reflecting drugs dispensed under Tumbleson's password. Respondent's
contentions, provided only through counsel's unsworn declaration in a post-hearing
submission, was that the Tumbleson report, reflecting that the transactions occurred
around 10:30 p.m. on April 1, 2014, demonstrated the inherent unreliability of Omnicell
reports as Tumbleson worked the same hours as respondent and respondent left work
hours before that. As noted by complainant, the record is entirely silent regarding
Tumbleson's schedule on April 1, 2014. Respondent's counsel's extemporaneous
remark is not evidence and cannot be the basis for challenging the presumption of
reliability of computer-generated documents.

        E.      Finally, respondent's claims about Farner's bias is not credited.
Respondent's very serious allegations were not supported by any contemporaneous
writings, witness testimony, or any other evidence to corroborate her version of

00030

events.[4] Farner testified credibly and precisely about how she prepared the interlineations and confirmed their accuracy.

F.     Respondent's own testimony affirmed that Patient Number 1191394, the patient to whom Vancomycin was administered, and Patient Number 0321924, the syncoptic patient, were treated if not directly by respondent, then in her presence. The same MRNs appear next to multiple transactions on the Omnicell report, further buttressing the conclusion that the numbers interlineated on the Omnicell report correctly correlate to the patients and patient care at issue here.

## SJMC Investigation

20.   A.     Kathleen Trigueiro (Trigueiro) is a registered nurse and currently works as director of employee health and education at Los Robles Hospital. In 2014,

---

[4] In a post-hearing motion, complainant requested leave to re-open the record to introduce declarations from Farner and others denying respondent's allegations of suborning perjury and related misconduct. Complainant's counsel argued that the motion was warranted because she had already "released Farner and others from their subpoenas" and so could not call them again to testify in rebuttal to respondent's assertions. Complainant's motion is denied. Complainant's counsel's decision to release the witnesses was entirely in her discretion and control and may have been improper given the language of the prehearing conference order directing the parties to keep witnesses available throughout the duration of the hearing. As such, there is no basis for reopening the record. Moreover, even if the declarations were admitted, as administrative hearsay, they cannot stand alone to establish a factual finding. (Gov. Code, § 11513.)

23

Trigueiro was the director of employee health at SJMC, including maintaining the policies and practices related to the hospital's drug-free workplace standards. The policies included a set of "problem indicators" for supervisors to consider in determining whether an employee was impaired by drugs or alcohol. These indicators included many of the behaviors and mannerisms attributed to respondent on the two days in question: avoidance of assignments or responsibilities, blaming others for changes in personal work performance, drowsiness or sleeping on the job, decreased quality of work produced, and increased aggressiveness or defensiveness. (See Exh. C-5, p. 101.)

B.     In April 2014, Trigueiro was in communication with the vendors responsible for testing respondent's urine. Because she knew that one of the drugs dispensed from Omnicell without authorization was Dilaudid, she expressly inquired into whether there was any evidence of that drug in respondent's system. "[i]t turned out that it was not – the narcotic she was taking was not the Dilaudid." (Transcript, Vol. III, p. 30.)

C.     Trigueiro stated that the analysis was positive for alpha-hydroxyalprazolam, a metabolite of another benzodiazepine, alprazolam, also known as Xanax. Specifically, the test showed there were "317 milligrams per milliliter in the blood level." (Transcript, Vol. VII, p. 41.) Trigueiro also stated that she reviewed a list of respondent's prescribed medications and did not find a prescription for alprazolam or Xanax. (*Id.* at p. 42.)

D.     During her testimony, Triguiro was asked about whether there was any significance to the fact that on April 1, 2014, respondent behavior was not reported to management until many hours after it was first observed and that she was not tested until later still:

A        Any medication that you take, it's – there is a – it metabolizes in your system, so it becomes less and less. The onset is usually very quick, and then it will create what we call a "half-life," so where there's a less and less impact of the medication on the person's persona.

But it's also not too uncommon for people not to want to get involved, to just not really want to report out on their coworkers. And we frequently remind people it's a service to make sure that our patients are safe; it's a service often time to our coworkers, that may have problems, to have an opportunity to get help.

And, you know, the bottom line is we want to make sure that the environment is safe and our patients are safe. But the longer you take to report, the less evidence of significant drug levels are in the body.

(Transcript, Vol. III, p. 268.)

E.        Trigueiro also reviewed the test results from December 31, 2014. The results reflected nordazepam, oxazepam, and temazepam, all metabolites of Valium, a drug in the same drug family as Diazepam, were found in respondent's blood stream. Asked to explain the significance of these results, Trigueiro stated:

So, I wanted to help you understand, when Valium breaks down, you don't have the results of Valium in the bloodstream; you have these metabolites that show up – and so that you could understand why that happens. It

25

> doesn't indicate why they took it or how fast their body
> metabolized it; it only identifies that it was an active
> medication in her system at the time.

(Transcript, Vol. III, p. 51.)

21.    During his testimony, Carvotta was also questioned about the relevance of respondent's drug tests. He stated that Valium and Dilaudid were of the same family of drugs and are detected in the blood stream through their metabolites. Valium and Dilaudid have a half-life (diminished effect) of between 20 to 80 hours while the metabolite of Xanax, alpha-hydroxyalprazolam, is active in the body for no more than approximately two days.

## Board Investigation

22.    A.    Mark Felton (Felton) is a sworn investigator assigned to the Department of Consumer Affairs, where he has worked for 17 years. Prior to joining the Department of Consumer Affairs, Felton was a police officer for the City of Tustin and an investigator for the Ventura County District Attorney's Office. Felton was assigned to investigate respondent after each of SJMC's complaints to the Board.

B.    In the course of his first investigation of respondent, Felton obtained a report from the Controlled Substance Utilization Review and Evaluation System (CURES), California's prescription drug monitoring program. At the hearing, Felton was asked why he obtained respondent's CURES report during his investigation.

> A    . . . it shows what the respondent is on prescription-
> wise, and it's just part of our standard narrative anytime we

26

have allegations of controlled substance diversion or under
the influence.

Q.     And the purpose is --- why is it run, to determine
what?

A     There's a correlation between – in many cases, there
is a correlation between how much someone is being
prescribed and the chance of someone diverting or being
under the influence at work.

(Transcript, Vol. III, p. 192.)

C.     Felton testified at the hearing and was asked about entries dated
February 10, 2014 on respondent's CURES report showing two prescriptions filled on
that day, both for 30 tablets of 10 milligrams of Valium, a benzodiazepine. Felton was
also asked about entries dated April 11, 2014, also showing two prescriptions filled
that day, again both for 30 tablets of 10 milligrams of Valium. Felton stated that the
two prescriptions for the same medications, were indicia of "doctor shopping"
(Transcript, Vol. III, p. 193) (i.e., obtaining multiple prescriptions for the same
medication from different doctors) though he declined to affirmatively state this had
occurred in the instant matter.

D.     Felton interviewed respondent multiple times in the course of his
investigation. He stated that she denied being under the influence of drugs or of
diverting drugs on April 1, 2014. Respondent also told Felton that she believed she
accessed medication on doctors' verbal orders that they failed to follow up with
written documentation, thus resulting in a record of drugs apparently dispensed
without orders.

27

E.      In subsequent interviews, respondent offered several other defenses: her charting was unclear because she was a poor speller and writer; she made mistakes on April 1, 2014, because she was extremely busy training a new nurse; and that the allegations against her were entirely fabricated and part of a conspiracy to terminate her because she had complained of unsafe conditions related to staffing at SJMC's Emergency Department. (See Transcript, Vol. III, p. 196-201.)

F.      For the second investigation, Felton documented witnesses' observations of respondent's appearance, behavior, poor and incomplete charting, and difficulty logging into the computer. Felton especially noted witnesses' observations of respondent's long, slow blinks, which he stated was, in his experience, commonly seen among drug addicts.

G.      On July 15, 2015, Felton conducted an in-person interview with respondent, who arrived accompanied by her attorney. At the conclusion of the interview, he asked respondent when she had last taken prescription medication. Respondent replied that she had taken one Vicodin tablet the previous evening and one Norco tablet two nights prior. Both Vicodin and Norco are opioid pain medications consisting of a combination of acetaminophen and hydrocodone. Felton asked respondent to submit to a drug screening. Respondent agreed and did so immediately following the meeting. The test findings reflected that respondent had hydrocodone and Oxycodone, an opioid pain medication, in her system.

23.    A.      Gregory Knutzen (Knutzen) holds an undergraduate and master's degree in nursing and is Board-certified in multiple nursing specialties, including acute care, critical care, and emergency nursing. He is currently employed as a nurse practitioner at City of Hope Hospital. Knutzen served as the expert witness for the

28

Board and prepared two reports about respondent in conjunction with the Board's investigation.

B.      Knutzen testified at the hearing. Regarding the events of April 1, 2014, he stated that he concluded respondent had committed gross negligence. Knutzen based his conclusion on patient chart entries and other documentation indicating the patient was infused with Vancomycin at twice the normal rate. Knutzen stated that such a mistake may cause "red man syndrome, where they can have an anaphylactoid reaction, as well as hypertension has been reported with these patients." (Transcript, Vol. II, pp, 180-181.)

C.      Knutzen also determined that respondent engaged in unprofessional conduct by accessing medications without authorization and by being impaired while on duty. Knutzen based his conclusions on the Omnicell report transaction attributed to be for Patient Number 0321924, a synoptic (prone to fainting from low blood pressure) patient for whom the medication dispensed, a two milligram tablet of hydromorphone, was contraindicated and for whom there were no orders for this medication. Knutzen also noted that the Omnicell report did not indicate the medication had been wasted. Knutzen stated that, since patient records show the medication was never ordered or administered and was not wasted, he could only conclude that it had been diverted. Other discrepancies in patient charting, medication administered before orders, post-dated charting, for instance, further informed Knutzen's opinion that respondent had diverted drugs.

D.      Regarding the events of December 31, 2014, Knutzen determined that, based on the witness statements in the investigation file, respondent was working while impaired and that impairment was the result of drugs she had ingested.

29

E.      Knutzen concluded that respondent exhibited indicia of drug addiction based on the results of the drug tests she underwent and based on summary records of prescriptions she filled. In particular, he noted respondent filled Vicodin prescriptions twice on the same day in February and April, 2014. Knutzen also stated that 10 milligrams is a very strong dosage.

## Respondent's Evidence

### RESPONDENT'S TESTIMONY

#### Events of April 1, 2014

24.    A.      Respondent began working at SJMC in October 1994 as a phlebotomist. Approximately a year later, respondent was promoted to clinical technician and then, in 2006, became a registered nurse in SJMC's emergency department. In 2010, respondent became a steward for the nurses' union.

B.      Respondent testified at the hearing. Regarding the events of April 1, 2014, she stated that she was not feeling her "hundred percent self" (Transcript, Vol. V, p. 11.) Respondent recalled Wilcox asked her to serve as the preceptor for Tumbleson and, because she did not feel well and was experiencing significant neck pain from a past injury, was initially reluctant to take on that responsibility. Nonetheless, respondent agreed after Wilcox told her Tumbleson was trained and experienced.

C.      Respondent stated that she told Tumbleson to independently care for the patients and only come and get her if there was something Tumbleson did not understand. Respondent maintained that Tumbleson agreed to her terms but requested to use respondent's password to access medications through Omnicell.

30

00038

Respondent vigorously refused the request and told Tumbleson such an arrangement would be a serious breach of security protocol.

D.     Asked how Tumbleson managed to get medications if she did not have access to the Omnicell, respondent answered:

> I put it this way: I did not pull any medications that day
> because I refused to. I said, "You are the nurse.· These are
> your patients.· You're pulling the medication."· So -- excuse
> me -- I don't know how she got her medication that day.

(Transcript, Vol. V, p. 54.)

Later in her testimony, respondent stated that at some time not established by the record, Sterling had appropriated respondent's password and that she had reported Sterling's action to a union representative, Chris Slane. Further, respondent believed that Sterling gave Tumbleson respondent's password and Tumbleson used it to access medications through Omnicell. (See Transcript, Vol. VI, p. 36.)

E.     Respondent stated that she began orienting Tumbleson by showing her the board where the nurse assignments were posted:

> I told the traveler, "You look at the board. On the board,
> there is going to be your name popping up. My name will
> be on top of it, but that doesn't mean he's my patient.
> You're the nurse on this case. You hold the license just like I
> do, so, therefore, you're doing everything for these patients.
> If you need me --I was told you have highly experience (sec)
> -- then you come and get me. I will be helping other nurses

31

do other tasks because we are so short all the time,
understaffed."

(Transcript, Vol. V, p. 13.)

      F.     Despite respondent's representations that she did not directly
supervise Tumbleson, respondent also maintained that at least toward the earlier part
of Tumbleson's shift, she oversaw Tumbleson's work. "So I would generally, like, come
in, check up on her here and there, and when I checked up on her, I would, like, make
sure the patient was, you know, safe of course." (Transcript, Vol. V., p. 21.)

      G.     Regarding whether a doctor asked respondent about taking a
critically ill patient's vital signs, as described by Welborn and Serra, respondent agreed
that she had been asked about taking the vital signs of a critically ill patient, but her
version of what happened next was significantly different from their testimony:

> Dr. Goldberg was upset because no vital signs were in there
> because [Tumbleson] had no computer access that day. He
> approached me, and I said, "Dr. Goldberg, stop. I am not
> her nurse. You need to talk to her nurse. Her nurse is
> Wendy, and if you have a problem with that, you can go to
> [Sterling], because [Sterling] is the one that hired her here."
> So then after that, Goldberg was upset, of course, that no
> vitals were in the computer, that her -- his medications
> were given late. And I said, "You know, Doctor" -- and I
> sarcastically said it. I said, "There's [Tumbleson] right there.
> Go ask her." [Tumbleson] could not answer to his questions

32

because [Tumbleson] did not know what she was doing. So

my day continued to keep an eye on her.

(Transcript, Vol. V, pp. 54-55.)

      H.    Respondent stated that, during the relevant period and since, she has had severe pain and has suffered from multiple psychiatric conditions such as depression, post-traumatic stress disorder, panic attacks, and insomnia, for which she was and continues to be prescribed medication. Respondent maintained that she never took any medication other than ibuprofen or Tylenol while caring for patients. (See Transcript, Vol. V, pp. 68-69.) In particular, with respect to the events of April 1, 2014, respondent stated:

> I couldn't sleep because of my pain, and I couldn't sleep
> because of my insomnia . . . But then I knew if I called in
> sick, it was going to create a bigger problem because Sheri
> Sterling already had took (sic) me to Angela Meza's office
> to try to write me up for my absences.

(Transcript, Vol. V, p. 70.)

      I.    Later in her testimony, respondent maintained that she was free to take time off from work if she did not feel up to working:

> And I told Paul [Wilcox], "I don't think [Tumbleson]
> has the experience you told me. So you're going to help me
> with her because I told you I wasn't feeling good today, and
> if I wasn't feeling good today, I could go home right now,

33

00041

> and --- because my doctor allows me to leave whenever I
> want to if I cannot stand up all day because of my injury."

(Transcript, Vol. V, p. 22.)

     25.    A.    One of the medication errors at issue in the matter is whether Dilaudid (also referred to by its generic name, hydromorphone in hospital records) was given to Patient Number 0321924, an elderly man who had syncope. According to a written statement dated April 16, 2014, from the patient's treating physician, Bryan Goldberg, M.D., it was not his practice to prescribe Dilaudid to patients while they were being treated in the emergency department and he would never prescribe it to an elderly patient with syncope. (See Exh. C-4, p. 142.) The Omnicell report showed that, on April 1, 2014, Dilaudid was dispensed at 9:12 a.m. in a two milligram tablet form for this patient under respondent's password.

          B.    Respondent recalled the incident but maintained that it was Tumbleson who administered the medication. Contrary to Dr. Goldberg's representation, respondent maintained that not only did Tumbleson give Dilaudid to a synoptic patient, she did so in Dr. Goldberg's presence:

> So Wendy Tumbleson continuously gave
> medications. How can they – how can it be that there was
> only three medications on the Omnicell pulled from her?[5]
> When I saw that, my mouth about dropped. I was like, "How

---

[5] Another Omnicell report of medications dispensed under a password issued to Tumbleson show three drugs dispensed on April 1, 2014. (See Exh. R-19.)

> about all the medications you gave with Dr. Goldberg right
> next to you? With that critical patient?"
>
> And I stated, "Syncope patients, I would never ever
> give a Dilaudid to a syncopal patient."

(Transcript, Vol. V, pp. 26-27.)

26.    Respondent stated that throughout the day, she saw Tumbleson heading
for Sterling's office and would stop her:

> So when she would run to Sheri, I was like, "What are you
> doing in the office? You should be medicating your patients
> that you're late on. This is what you should be doing. Office,
> go if there is a problem. There is no problem with you;
> right? You're feeling okay?" And she said, "Yeah. I'm feeling
> okay."

(Transcript, Vol. V, p. 30.)

27.    Respondent stated that one of the patients that day did require an
infusion of Vancomycin as noted in Tumbleson's declaration; however, it was Wilcox
and Tumbleson who administered it and were responsible for the rapid infusion.
According to her testimony, respondent's only involvement was to correct the error,
not cause it:

> That rate was doubled at a rate – I don't recall the rate, but
> it was over – less . . . than the hour and a half to two hours
> we have to run vanco. And vancomycin should be run very

00043

slowly because it's viscus, it's very potent, and you could

cause the patient harm if it's ran a lot faster.

So I looked, and Paul already had walked out, and

Tumbleson was doing something with – at the patient's

bedside. I – I walked her out, and I said – I stopped the

machine immediately. I stopped the machine immediately. I

stopped the machine. I walked her out, and I said, "Did you

know that you're running a rate at such and such rate,

double the amount of the rate?"

(Transcript, Vol. V, p. 48.)

28.     Respondent stated that "at 6:45, exactly" (Transcript, Vol. V., p. 55) on
April 1, 2014, she was summoned to Sterling's office for a meeting and subsequent
drug testing. This is significant because the last transaction in the Omnicell report
occurred at 6:54 p.m. If respondent's testimony is credible, it is extremely unlikely that
respondent accessed the Omnicell just nine minutes after being called to Sterling's
office for a disciplinary meeting. As set out in detail in Factual Finding 38, respondent's
testimony here is not credible.

29.     Time keeping records introduced at the hearing show that respondent's
workday ended at 7:30 p.m. on April 1, 2014. (Exh. C-4, p. 28.)

### Events of December 31, 2014

30.     A.      Respondent recalled arriving at work on December 31, 2014 a few
minutes before her shift began at 7:00 a.m. and having difficulty logging into the

36

computer. At the same time, respondent was assigned several patients including one who needed to be transported for a magnetic resonance imaging (MRI).

      B.     Respondent stated she spent at least 40 minutes trying to log onto the computer at the nurse's station and an additional two hours trying to log in at a computer near the MRI machine. Throughout this time, respondent could not log in. She was finally able to log in when she returned to the nurse's station and, with the assistance of the hospital's help desk, determined that the "cap lock" was inadvertently activated.

      C.     Respondent estimated that she logged into her computer at 11:00 a.m. After briefly using the computer to check on her patients' status, she went to lunch, returning to work between noon and 12:15 p.m. (See Transcript, Vol. V., pp. 94-96.)

      D.     Sometime later that afternoon, respondent was directed to the disciplinary meeting with Morgan, Roberts, and Meza. Nina Wells (Wells), the union president, had been also called to the meeting to represent respondent. Respondent stated she had no idea why she was called in and did not display any of the behavior – slurring her speech, falling asleep, appearing confused – that the witnesses for complainant described. Respondent also denied preparing illegible or nonsensical documentation. On the contrary, respondent maintained that, because she had been unable to log onto the computer, she had not entered any documentation that day. Shown documentation with time-stamps after 11:00 a.m. under respondent's password and digital signature, respondent continued to maintain that the entries were not hers.

00045

E.     Respondent also testified that she had not slept at all the night before, had bags under her eyes, was blinking constantly because she has a dry eye condition and had forgotten her drops that day.

F.     Respondent stated that the disciplinary meeting, drug tests, and subsequent employment actions were based on fabricated allegations and in retaliation to her union activity and efforts to maintain safety standards by filings Assignments Despite Objection forms (ADO's) used to protest understaffing.

G.     After the meeting, respondent was taken for drug testing. Respondent maintained that she used the bathroom because she was not aware of a protocol against that and she urgently needed to urinate. She estimated she spent five or six minutes in the bathroom.

H.     Respondent stated that, once at the drug-testing facility, she told the technician she had taken Vicodin a few days before. (See Transcript, Vol. V, p. 128.)

## Respondent's Additional Witnesses

31.   A.     Tamara Schexnayder (Schexnayder) has been a registered nurse for 18 years and worked at SJMC from 1994 to 1996 and from 2002 to 2016. She has known respondent since 1994 and has worked alongside her at the Emergency Department many times.

B.     On April 1, 2014, Schexnayder was working at SJMC's emergency department with respondent. She stated that respondent appeared "normal" (Transcript, Vol. IV, p. 152) that day. Schexnayder was also present at the meeting toward the end of the day where Sterling sent respondent for drug testing.

38

32.     The Omnicell report reflects that Schexnayder served as a witness to respondent as she wasted drugs on April 1, 2014. During her testimony at the hearing, Schexnayder stated that drugs are sometimes mistakenly dispensed, are sometimes inadvertently tucked into an overworked nurse's pocket, not to be discovered until after the nurse goes home, and are sometimes dispensed pursuant to a doctor's verbal order. Schexnayder did not state that there had been any such mistake, verbal order, or emergency situation on that day.

33.     · A.     Dr. Nina Wells (Wells) is SJMC's clinical education coordinator, responsible for the hospital's in-house education program. She holds a Doctorate of Nursing Practice, a master's degree in education and a bachelor's degree in nursing. Wells is also the president of the nurses' union's local chapter, a position she has held for approximately nine years.

B.     Wells has known respondent for 15 years. Wells testified at the hearing and stated that respondent was a quality nurse and very concerned with patient safety. That concern was behind her repeated filings of ADO's to alert management to insufficient nurse staffing.

C.     Wells recalled attending a disciplinary meeting with Morgan, Meza, and respondent on December 31, 2014. Wells stated that respondent began to explain why she had been having difficulty logging on to the computer and how that had caused other delays.

> So [respondent], as she was speaking to [Morgan], she is
> going in and out of her first language. So she – her
> first/native language is Spanish. So she was going from
> Spanish to English, which is justifiable. It wasn't like she

39

stayed solely in Spanish. But, you know, she was vacillating

between English and Spanish.

(Transcript, Vol. IV, p. 87.)

      D.    Wells went on to state that respondent did not seem impaired. Asked more specifically whether respondent exhibited signs of impairment such as disorganization, confusion, slurred speech, or inability to focus, Wells answered in the negative.

      E.    Wells stated that, in her experience, Omnicell reports often contained errors. For instance, in emergency situations when a patient is in imminent crisis, medication may be pulled, never used, and never accounted for.

      F.    Wells stated that nurses who file ADO's are sometimes subjected to harassment in the form of increased supervision and criticism by management. Wells also stated that she did not directly witness respondent being harassed; rather, she heard about it in the course of her duties as union president:

> I can say, based on the – issues that were being brought up
> about [respondent] and her nursing ability and her peer
> engagement, and also, sometimes falling over into the
> patient-care realm, it sounded – seemed to me – my
> perception was that [Sterling] was not happy with Veronica.
>
> There was an underlying malice intent. It seemed like no
> matter what [respondent] did, it was always a problem, so –
> and that is my being in [disciplinary interviews] or me being
> in HR and hearing some of these allegations – issues where

40

> other stewards had defended [respondent] and then
> coming back to talk to me.

(Transcript, Vol. IV, p. 82.)

34.   A.   Dr. Ashraf Mozayani (Mozayani) served as an expert witness for respondent. Mozayani received a doctor of pharmacy degree from the University of Tehran, a doctorate in pharmaceutical sciences from the University of Alberta, and is a board-certified forensic toxicologist. She has worked in a number of positions in both the private sector and government, including serving as a laboratory specialist for the Alberta government, chief toxicologist for the District of Columbia, and chief toxicologist and laboratory director for the Harris County Chief Medical Examiner's Office in Texas. After 15 years with the Harris County Chief Medical Examiner's Office, Mozayani became the forensic science executive director at Texas Southern University where she also teaches. In addition, for the last approximately 20 years, Mozayani has run her own business, International Forensic Science Consultants, which primarily works with the federal government to bring forensic science knowledge and techniques to foreign countries.

B.   Mozayani has frequently served as an expert witness throughout the country particularly regarding cases involving issues of drug abuse. She stated that she has testified both on behalf of the accused and the accuser and in about equal measure.

C.   Mozayani reviewed the lab results from the drug testing respondent underwent. She also reviewed the transcript from the hearing dates preceding her appearance at the hearing. During her testimony, Mozayani made the following observations based on her review:

41

(i) The tests were based on urine specimens from respondent. Unlike blood, hair, or saliva tests, the available information to be gleaned from urine tests is limited. Urine tests can only reflect exposure to certain substances; they cannot determine whether the amount of drugs in the system has any therapeutic effect. Thus urine tests cannot help determine whether the subject is impaired by an ingested substance.

(ii) Urine tests are not reliable. They give a "snapshot" of substances in the system that may or may not reflect the subject's general condition. Repeating a urine test a short while after the first test may yield entirely different results.

(iii) Urine tests results are binary, i.e., either positive for a substance or negative. Laboratories adhere to somewhat arbitrary cutoff amounts set by government agencies to make this determination. Thus, a subject with just less than the cut off amount of the tested substance will receive a negative result and one with just slightly more will receive a positive result. Add to that a 20 percent plus/minus error rate and these binary results, if they are based on results close to the established cut off amount, are inherently unreliable.

(iii) The drug ingested is referred to as the 'parent drug.' Because urine is one of the body's waste products, that parent drug may no longer be detectable there. Byproducts of the ingested drug, known as metabolites, may be detectable in urine. Some metabolites are not therapeutic, i.e., do not affect the system at any level.

35.   A.   Mozayani, applied these general principles to respondent's test results. The first drug test reflected 317 milligrams of alpha-hydroxyalprazolam, an inactive metabolite of alprazolam, a benzodiazepine. Mozayani noted that the cut off amount for this metabolite is 300 milligrams. The amount detected was very close to

42

that. If the standard error rate rule of plus or minus 20 percent is applied, it is potentially a false positive.

       B.     The second test reflected the metabolites of Valium, also a benzodiazepine. Mozayani opined that these results are consistent with finding respondent likely took the drug two nights before being tested.

       C.     Mozayani stressed that earlier testimony from Carvotta and Triguera stating that the drug tests revealed levels of drugs in respondent's blood, as opposed to her urine, are patently wrong. The records from the drug testing clearly show respondent was subjected to a urine test only. No blood was taken. The distinction, according to Moyazani, is extremely important because levels of drugs detected in respondent's urine, if detected in her blood, would signify extremely high usage. Here, the urine levels show relatively moderate usage.

       D.     Mozayani opined that the differing types of drugs revealed in the tests indicate that she is not likely an addict as, in Mozayani's experience, addicts tend to stick to a single drug of choice.

    36.    A.    David Gray (Gray) has been a registered nurse for 24 years and has spent his entire nursing career at SJMC. He is also a firefighter. Gray worked with respondent at various times when their schedules overlapped and had the opportunity to observe her nursing skills. Gray testified at the hearing and stated that respondent "always stood up for what was right. She would never accept anything less for her patients. She wanted to make sure they were well taken care (sic)." (Transcript, Vol. IV, p. 192.)

       B.     Gray stated that drugs are occasionally dispensed and wasted without documentation.

43

C.     Gray stated that he observed respondent under increased scrutiny from management, including Sterling. Gray had also experienced adverse employment actions, for instance less opportunities to serve as charge nurse. He attributed this to management retaliation for his own activism on behalf of staff nurses or patient care. During his testimony, Gray agreed with the statement that, prior to April 2014, he had been asked by other nurses to watch respondent because she might be impaired by medication. (See Transcript, p. 196.)

D.     Gray was not working on either of the two dates in question in this matter and has no knowledge of the specific events concerning respondent on those days.

37.     During a period not established by the record, respondent cared for Irma Centeno's (Centeno) mother while her mother was in home hospice. Centeno testified at the hearing and stated that respondent "was a blessing because my mother has been in in hospice before, and she's never had a nurse so loving and caring towards [her]." When Centeno's mother experienced a seizure, respondent acted immediately and may have saved her life. Centeno also stated she never witnessed respondent appearing impaired at work.

## Analysis Regarding Contested Facts

38.     A.     Respondent has contested each of the factual allegation underlying the disciplinary charges against her. Specifically, she denied that she worked while under the influence of controlled substances, that she diverted drugs, that she made, or at least oversaw without correcting, medical errors, and that her charting was unintelligible and incomplete.

44

B.       During her testimony, respondent admitted that she was tired to the point of exhaustion during the two days in question, held and sometimes took strong medications to alleviate symptoms of physical and mental illnesses, including within two to four days of her shift, and felt overworked and attacked by management and her colleagues. In this regard, her own testimony may well have been enough to explain certain mistakes. Respondent, however, denied making any sort of mistake, shifted blame to others, particularly Tumbleson, an unavailable witness[6] who had reported and documented her own version of the April 1, 2014 events.

C.       Complainant's witnesses were consistent, measured and, in some cases, clearly reluctant to contribute to a potentially career-ending development in respondent's life, they convincingly testified that ultimately, their concerns about patient safety had to trump other misgivings. Their observations of respondent's behavior and demeanor were consistent with impairment as it is commonly understood. The chart entries alone demonstrate the work of someone clearly not fit to undertake patient care.

39.       A.       Records introduced by complainant, including the controversial Omnicell report, are deemed reliable and reflective of respondent's actions. Respondent's testimony regarding a misappropriated password is not credited. She provided no corroborating evidence of any kind even though she understood what an exceedingly serious violation of security protocol that would be. Moreover, this explanation was not her first. When questioned by the Board investigator, respondent stated that she had dispensed medications pursuant to verbal doctors' orders. This not only contradicts respondent's testimony as to a misappropriated password, it also

---

[6] The record established that Tumbleson currently lives and works out of state.

contradicts respondent's repeated assertions that she did not engage in any direct patient treatment that day.

B.      The only potentially exculpatory factor is the last time entry on the Omnicell report, 6:54 p.m. combined with respondent's testimony about going to Sterling's office the same evening. Respondent stated that she was called off the floor at exactly 6:45 p.m., making it unlikely that she could have made entries into the Omnicell machine just nine minutes later.

C.      The human resources liaison, Meza, a witness for complainant, stated she recalled meeting with the managing nurse, Sterling, somewhere between 6:00 p.m. and 6:30 p.m. which somewhat corroborates respondent's time frame. However, Meza did not state how long she spoke with Sterling before respondent was asked to join them.

D.      During her testimony, Sterling stated that she received a complaint from Morgan about 6:00 p.m. She then followed up on Morgan's concerns by interviewing Tumbleson, calling senior management for advice, requesting that the pharmacy department generate an Omnicell report under respondent's password, reviewed respondent's charting and the Omnicell report. and then met with Meza before summoning respondent. This litany of events supports a longer time frame than the 45 minutes available if respondent was indeed called from the floor at 6:45 p.m. Moreover, the only clear evidence that respondent met with Sterling and Meza at "exactly 6:45" is respondent's testimony. Given respondent's pattern of deception and unreliable reconstruction of events in her testimony, her assertion that she was summoned to Sterling's office at "exactly 6:45" is not credited.

46

E.      Similarly, the patient records from December 31, 2014, including electronic charting attributed to respondent are deemed to be that of respondent. Respondent stated she logged in to her computer by 11:00 a.m. that day, a time before the date stamps on the chart entries. Notes of Roberts, the charging nurse on duty at the time reflect the same information. The inherent reliability of the computer-generated records was established.

40.      Respondent disputes that she is a drug addict. The record established that she did have prescriptions for the drugs found in her system; however, both the Board's inspector and designated expert provided convincing testimony that the patterns and amounts of prescriptions were consistent with addict behavior. Respondent's expert, Mozayani, was clearly an extremely knowledgeable and accomplished toxicologist and convincingly pointed out an error hospital and Board personnel had made in believing respondent's test results were from blood specimens. But her testimony is overwhelmed by the convincing facts of intemperate, if not completely debilitating or fatal drug usage. As noted by several of the witnesses on behalf of complainant, almost any degree of impairment while on the job in a medical setting cannot be tolerated.

## Costs

41.      Complainant submitted evidence in support of the Bureau's claim for investigation costs of $14,549.50 and enforcement costs of $21,285, a total of $31,834.50. The costs are deemed reasonable. Respondent did not present evidence that paying these costs would cause a financial hardship.

47

# LEGAL CONCLUSIONS

## Purpose of Disciplinary Proceedings

1.      Administrative proceedings to revoke, suspend or impose discipline on a professional license are noncriminal and non-penal; they are not intended to punish the licensee but rather to protect the public. (*Sulla v. Board of Registered Nursing (2012)* 205 Cal.App.4th 1195, 1206.)

2.      The protection of the public is the Board's highest priority when exercising its disciplinary functions. (§ 2708.1.)[7] Whenever the protection of the public is inconsistent with other interest sought to be promoted, the protection of the public "shall be paramount." (*Ibid.*)

## Standard and Burdon of Proof

3.      A registered nursing license is considered professional, not vocational. (*Sulla v. Board of Registered Nursing, supra*, 205 Cal.App.4th at 1200-1201.) To impose discipline on a professional license, complainant must prove cause for discipline by clear and convincing evidence. (*Steinberg v. California State Board of Pharmacy* (2015) 239 Cal.App.4th 1159, 1171; *Ettinger v. Board of Medical Quality Assurance* (1982) 135 Cal.App.3d 853, 856.) "Clear and convincing evidence" requires a finding of high probability, or evidence so clear as to leave no substantial doubt; sufficiently strong evidence to command the unhesitating assent of every reasonable mind. (*Katie V. v. Sup. Ct.* (2005) 130 Cal.App.4th 586, 594.)

---

[7] Undesignated statutory citations are to the Business and Professions code.

00056

## Causes for Discipline

4.      Section 2750 provides that the Board may discipline any licensee, including a licensee holding an inactive license, for any reason provided in the Nursing Practice Act. (§2750 et seq.) Section 2764 provides that the expiration of a license shall not deprive the Board of jurisdiction to proceed with a disciplinary proceeding against the licensee or to render a decision imposing discipline on the license.

5.      A.      Section 2761, subdivision (a) provides that the Board may take disciplinary action against a certified or licensed nurse or deny any application for a certificate or license for unprofessional conduct. "Unprofessional conduct" includes "incompetence, or gross negligence in carrying out usual certified or licensed nursing functions." (§ 2761, subd. (a)(1).)

B.      Under California Code of Regulations, title 16 (Regulation), section 1443, 'incompetence' is "the lack of possession of or the failure to exercise that degree of learning, skill, care and experience ordinarily possessed and exercised by a competent registered nurse as described in [Regulation] [s]ection 1443.5]" Regulation section 1443.5 states:

> A registered nurse shall be considered to be competent
> when he/she consistently demonstrates the ability to
> transfer scientific knowledge from social, biological and
> physical sciences in applying the nursing process, as
> follows:
>
> (1) Formulates a nursing diagnosis through observation of
> the client's physical condition and behavior, and through

49

interpretation of information obtained from the client and others, including the health team.

(2) Formulates a care plan, in collaboration with the client, which ensures that direct and indirect nursing care services provide for the client's safety, comfort, hygiene, and protection, and for disease prevention and restorative measures.

(3) Performs skills essential to the kind of nursing action to be taken, explains the health treatment to the client and family and teaches the client and family how to care for the client's health needs.

(4) Delegates tasks to subordinates based on the legal scopes of practice of the subordinates and on the preparation and capability needed in the tasks to be delegated, and effectively supervises nursing care being given by subordinates.

(5) Evaluates the effectiveness of the care plan through observation of the client's physical condition and behavior, signs and symptoms of illness, and reactions to treatment and through communication with the client and health team members, and modifies the plan as needed.

(6) Acts as the client's advocate, as circumstances require, by initiating action to improve health care or to change decisions or activities which are against the interests and

50

wishes of the client, and by giving the client the opportunity to make informed decisions about health care before it is provided.

6.   A.   Complainant alleged gross negligence as a basis for the disciplinary action against respondent. Complainant cited administering a medication, Vancomycin, at twice the normal rate, removal and failure to document administration and wasting of controlled substances, and consuming controlled substances while working. Clear and convincing evidence did not establish that respondent committed gross negligence by infusing a patient with Vancomycin at twice the recommended rate, potentially endangering the patient. The only percipient witness to the event, Tumbleson, did not testify. Her report to management as relayed by Sterling during the hearing is administrative hearsay as is her declaration. In the absence of direct evidence, administrative hearsay is insufficient to establish cause. (Gov. Code, § 115113.) (Factual Findings 6 & 8 and Legal Conclusion 5.)

B.   Clear and convincing evidence did establish that respondent is subject to disciplinary action for gross negligence because, on April 1, 2014, respondent withdrew Dilaudid from the Omnicell and failed to document its administration or wasting for Patient Number 0321924 and Patient Number 1136316, as well as for consuming controlled substances which impaired her ability to safely conduct registered nurse practice. (Factual Findings 4-20 & 38-40 and Legal Conclusion 5.)

7.   A.   Section 2762 provides that unprofessional conduct also includes doing any of the following:

51

a. Obtain or possess in violation of law, or prescribe, or except as directed by a licensed physician and surgeon, dentist, or podiatrist administer to himself or herself, or furnish or administer to another, any controlled substance as defined in Division 10 (commencing with Section 11000) of the Health and Safety code or any dangerous drug or dangerous device as defined in Section 4022.

b. Use any controlled substance as defined in Division 10 (commencing with Section 11000) of the Health and Safety Code, or any dangerous drug or dangerous device as defined in Section 4022 . . . to an extent or in a manner dangerous or injurious to himself or herself, any other person, or the public or to the extent that such use impairs his or her ability to conduct with safety to the public the practice authorized by his or her license.

B.       Hydromorphone (Valium and Dulaudid) is a Schedule II controlled substance pursuant to Health and Safety Code section 11055, subdivision (b)(1)(j) and a dangerous drug pursuant to section 4022. Hydrocodone (Vicodin and Norco) is a schedule III controlled substance pursuant to Health and Safety Code section 11057, subdivision (d)(16) and a dangerous drug pursuant to section 4022.

8.       Clear and convincing evidence established that respondent is subject to disciplinary action because on April 1, 2014, respondent withdrew Dilaudid for Patient Number 0321924 and Patient Number 1136316 without documenting its administration or wasting. (Factual Findings 14 –19 & 38-40 and Legal Conclusions 5 & 7.)

52

9.      Clear and convincing evidence established that respondent is subject to disciplinary action because on April 1, 2014, respondent made false or grossly incorrect entries into patients' charts when respondent withdrew Dilaudid for Patient Number 0321924 and Patient Number 1136316 without documenting its administration or wasting. (Factual Findings 14 –19 & 38-40 and Legal Conclusions 5 & 7.)

10.     Clear and convincing evidence established that respondent is subject to disciplinary action because on April 1, 2014, respondent consumed controlled substances which impaired her ability to safely conduct registered nurse practice. (Factual Findings 4-20 & 38-40 and Legal Conclusion 7.)

11.     Clear and convincing evidence established that respondent is subject to disciplinary action because on December 31, 2014, respondent consuming controlled substances which impaired her ability to safely conduct registered nurse practice. (Factual Findings 9-13 & 38-40 and Legal Conclusion 7.)

## Discipline

### BOARD GUIDELINES FOR DETERMINING DISCIPLINE

12.     A.      The Board has adopted recommended guidelines and probation terms for Nursing Practice Act violation (Guidelines). Under the Guidelines, the general guiding principal is as follows:

> If at the time of the hearing, the [ALJ] finds that the
> respondent for any reason is not capable of safe practice,
> the Board favors outright revocation of the license. If,
> however, the respondent has demonstrated a capacity to

53

practice safe nursing, a stayed revocation order with
probation is recommended.

(Guidelines, p. 1.)

    B.    Factors to consider in determining the appropriate level of
discipline are:

    1.    Nature and severity of the act(s), offenses, or crime(s)
under consideration.

    2.    Actual or potential harm to the public.

    3.    Actual or potential harm to any patient.

    4.    Prior disciplinary record.

    5.    Number and/or variety of current violations.

    6.    Mitigation evidence.

    7.    Rehabilitation evidence.

    8.    In case of a criminal conviction, compliance with
conditions of sentence and/or court-ordered probation.

    9    Overall criminal record.

    10.    Time passed since the act(s) or offense(s) occurred.

54

      11.     If applicable, evidence of expungement proceedings pursuant to Penal Code Section 1203.4.

(Guidelines, p. 2.)

     13.     Applying the relevant criteria to the instant matter, respondent's use and possible abuse of controlled substances is ongoing and unacknowledged as a potential problem for her. Additionally, respondent's misconduct is serious and severe, present and potential danger to the public remains a clear concern, and she has not provided any evidence of mitigation or rehabilitation.

     14.     Remorse for one's conduct and the acceptance of responsibility are the cornerstones of rehabilitation. Rehabilitation is a "state of mind" and the law looks with favor upon rewarding one who has achieved "reformation and regeneration." (Pacheco v. State Bar (1987) 43 Cal.3d 1041, 1058.) Respondent denies each and every allegation, accepts no responsibility, and exhibits no remorse. Fully acknowledging the wrongfulness of past actions is an essential step towards rehabilitation. Instead, respondent's testimony indicates that there is no change in attitude from the time of these incidents.

     15.     Respondent has indicated that she is a dedicated and talented nurse and has presented corroborating evidence supporting her position. However; regardless of her capabilities, she cannot practice safely while impaired. Respondent has not expressed or demonstrated any self-awareness about her addiction or any sense of responsibility or accountability for its consequences. Under these circumstances, there is no penalty consistent with public safety other than revocation of her license, as set forth in the Order below.

00063

## COSTS

16.     Under Code section 125.3, a licensee may be ordered to pay the reasonable costs of the investigation and enforcement of the case. In *Zuckerman v. State Board of Chiropractic Examiners* (2002) 29 Cal. 4th 32, the California Supreme Court considered whether a similar cost recovery provision impermissibly discouraged licensees from exercising their due process rights to a hearing before their licenses could be revoked or suspended. The Court determined that cost recovery for investigation and prosecution is permissible as long as certain conditions are met: assessment of the costs will not unfairly penalize a licensee who is found to have committed some wrongdoing but has used the hearing process to reduce the charges or the severity of the discipline; the licensee has a subjective belief in the merits of her position; the licensee has the means to pay the costs; and the costs are not disproportionally large when considered in the context of the innocuousness of the charge at issue. (*Zuckerman, supra,* 29 Cal. 4th at p. 45.)

17.     Here, respondent failed to raise challenges sufficient to significantly reduce the charges against her or the severity of the penalty. Additionally, the Bureau's costs for investigation and enforcement have been deemed to be reasonable and respondent has not provided any evidence supporting a conclusion that she does not have the means to pay the costs. Revocation of her license, however, will limit her earning capacity. Accordingly, it is appropriate to award the Bureau the costs it seeks only if her license is reinstated at some future time.

56

# ORDER

(1)     Respondent Veronica Flores's Registered Nurse License Number 670536, is revoked.

(2)     Complainant's request for prosecutorial costs is granted. If and when respondent's license is reinstated, she shall pay to the Board costs associated with its investigation and enforcement pursuant to Business and Professions Code Section 125.3 in the amount of $31,834.50. Respondent shall be permitted to pay these costs in a manner approved by the Board. Nothing in this provision shall be construed to prohibit the Board from reducing the amount of cost recovery upon reinstatement of the license.

DATE:   September 13, 2019

DocuSigned by:

*Deena R. Ghaly*

5D13AC50FBAD477...

DEENA R. GHALY

Administrative Law Judge

Office of Administrative Hearings

57

1  XAVIER BECERRA
   Attorney General of California
2  MARC D. GREENBAUM
   Supervising Deputy Attorney General
3  MORGAN MALEK
   Deputy Attorney General
4  State Bar No. 223382
    300 So. Spring Street, Suite 1702
5   Los Angeles, CA  90013
    Telephone:  (213) 269-6278
6   Facsimile:  (213) 897-2804
   *Attorneys for Complainant*

7

8                          BEFORE THE
                  BOARD OF REGISTERED NURSING
9             DEPARTMENT OF CONSUMER AFFAIRS
                    STATE OF CALIFORNIA

10

11  In the Matter of the Accusation Against:        Case No.   *2018-651*

12  **VERONICA FLORES**                             A C C U S A T I O N
    **1651 Florentina Drive**
13  **Oxnard, CA  93030**

14  **Registered Nurse License No. 670536**

15                              Respondent.

16

17

18

19  Complainant alleges:

20                              **PARTIES**

21      1.    Joseph L. Morris, PhD, MSN, RN (Complainant) brings this Accusation solely in his

22  official capacity as the Executive Officer of the Board of Registered Nursing, Department of

23  Consumer Affairs.

24      2.    On or about December 8, 2005, the Board of Registered Nursing (Board) issued

25  Registered Nurse License Number 670536 to Veronica Flores (Respondent).  The Registered

26  Nurse License was in full force and effect at all times relevant to the charges brought herein and

27  will expire on November 30, 2019, unless renewed.

28  ///

                                    1

## JURISDICTION

3.     This Accusation is brought before the Board, Department of Consumer Affairs, under the authority of the following laws. All section references are to the Business and Professions Code unless otherwise indicated.

4.     Code section 2750 provides, in pertinent part, that the Board may discipline any licensee, including a licensee holding a temporary or an inactive license, for any reason provided in Article 3 (commencing with section 2750) of the Nursing Practice Act.

5.     Code section 2764 provides, in pertinent part, that the expiration of a license shall not deprive the Board of jurisdiction to proceed with a disciplinary proceeding against the licensee or to render a decision imposing discipline on the license. Code section 2811(b) provides, in pertinent part, that the Board may renew an expired license at any time within eight years after the expiration.

## STATUTORY PROVISIONS

6.     Code section 2761 provides in pertinent part:

"The board may take disciplinary action against a certified or licensed nurse or deny an application for a certificate or license for any of the following:

"(a) Unprofessional conduct, which includes, but is not limited to, the following:

"(1) Incompetence, or gross negligence in carrying out usual certified or licensed nursing functions."

7.     Code section 2762 provides in pertinent part:

"In addition to other acts constituting unprofessional conduct within the meaning of this chapter [the Nursing Practice Act], it is unprofessional conduct for a person licensed under this chapter to do any of the following:

"(a) Obtain or possess in violation of law, or prescribe, or except as directed by a licensed physician and surgeon, dentist, or podiatrist administer to himself or herself, or furnish or administer to another, any controlled substance as defined in Division 10 (commencing with Section 11000) of the Health and Safety Code or any dangerous drug or dangerous device as defined in Section 4022.

2

1  "(b)  Use any controlled substance as defined in Division 10 (commencing with Section

2  11000) of the Health and Safety Code, or any dangerous drug or dangerous device as defined in

3  Section 4022, or alcoholic beverages, to an extent or in a manner dangerous or injurious to

4  himself or herself, any other person, or the public or to the extent that such use impairs his or her

5  ability to conduct with safety to the public the practice authorized by his or her license."

6  **REGULATORY PROVISION**

7  8.  California Code of Regulations, title 16, section 1442, states:

8  "As used in Section 2761 of the code, 'gross negligence' includes an extreme departure from

9  the standard of care which, under similar circumstances, would have ordinarily been exercised by

10  a competent registered nurse. Such an extreme departure means the repeated failure to provide

11  nursing care as required or failure to provide care or to exercise ordinary precaution in a single

12  situation which the nurse knew, or should have known, could have jeopardized the client's health

13  or life."

14  9.  California Code of Regulations, title 16, section 1443, states:

15  "As used in Section 2761 of the code, 'incompetence' means the lack of possession of or the

16  failure to exercise that degree of learning, skill, care and experience ordinarily possessed and

17  exercised by a competent registered nurse as described in Section 1443.5."

18  10.  California Code of Regulations, title 16, section 1443.5 states:

19  "A registered nurse shall be considered to be competent when he/she consistently

20  demonstrates the ability to transfer scientific knowledge from social, biological and physical

21  sciences in applying the nursing process, as follows:

22  "(1)  Formulates a nursing diagnosis through observation of the client's physical condition

23  and behavior, and through interpretation of information obtained from the client and others,

24  including the health team.

25  "(2)  Formulates a care plan, in collaboration with the client, which ensures that direct and

26  indirect nursing care services provide for the client's safety, comfort, hygiene, and protection, and

27  for disease prevention and restorative measures.

28

3

"(3) Performs skills essential to the kind of nursing action to be taken, explains the health treatment to the client and family and teaches the client and family how to care for the client's health needs.

"(4) Delegates tasks to subordinates based on the legal scopes of practice of the subordinates and on the preparation and capability needed in the tasks to be delegated, and effectively supervises nursing care being given by subordinates.

"(5) Evaluates the effectiveness of the care plan through observation of the client's physical condition and behavior, signs and symptoms of illness, and reactions to treatment and through communication with the client and health team members, and modifies the plan as needed.

"(6) Acts as the client's advocate, as circumstances require, by initiating action to improve health care or to change decisions or activities which are against the interests or wishes of the client, and by giving the client the opportunity to make informed decisions about health care before it is provided."

**COST RECOVERY**

11.   Code section 125.3 provides, in pertinent part, that the Board may request the administrative law judge to direct a licentiate found to have committed a violation or violations of the licensing act to pay a sum not to exceed the reasonable costs of the investigation and enforcement of the case.

**DRUG DEFINITIONS**

12.   **Hydromorphone (Dilaudid)** – a Schedule II controlled substance pursuant to Health and Safety Code section 11055 (b)(1)(j), and a dangerous drug pursuant to Business and Professions Code section 4022. It is a narcotic analgesic used for the relief of moderate to severe pain.

13.   **Hydrocodone (Vicodin and Norco)** is a schedule III controlled substance pursuant to Health and Safety Code section 11057 (d)(16) and a dangerous drug pursuant to Business of Professions Code § 4022. It is a narcotic analgesic used for the relief of moderate to moderately severe pain.

4

14. **Ativan (Lorazepam)**-a Schedule IV controlled substance pursuant to Health and Safety Code section 11057, and a dangerous drug pursuant to Business and Professions Code section 4022. It is a benzodiazepine used for the relief of anxiety, panic attack and chronic sleeplessness.

15. **Vancomycin** is an antibiotic used to treat a number of bacterial infections. It is recommended intravenously as a first-line treatment for complicated skin infections.

## ST. JOHN'S MEDICAL CENTER (FACTUAL ALLEGATIONS)

16. On or about April 1, 2014, Respondent was employed by Saint John's Medical Center (SJMC). The Director of SJMC filed a complaint with the Board on April 7, 2014, stating that on April 1, 2014, Respondent made a series of medication errors while assigned to the Emergency Room, which included doubled infusion rate errors, failed to document controlled substance withdrawals and administration of controlled substances, failed to administer physician ordered prescribed controlled substances and removed controlled substances from the Omicell system without physician orders. The director also reported that the Respondent exhibited unusual mannerisms such as lethargic and forgetful. It was later discovered that Respondent removed Lorazepam and Hydromorphone from the Omicell without physician's orders. Respondent was placed on immediate suspension for diverting controlled substances from SJMC.

17. SJMC staff complained to management about Respondent's odd behavior and symptoms of being under the influence of controlled substances and poor charting. During the Respondent's shift on April 1, 2014, a review of the Respondent's controlled substance withdrawals and medication administration revealed a number of suspicious controlled substance withdrawals and wasting.

18. On March 6, 2015, the Board received a complaint from the Director of Emergency Medical Services (SJMC) that Respondent was reported to be under the influence of a controlled substances on December 31, 2014 while on duty during her assigned shift in the Emergency Room at SJMC. Staff reported that Respondent was slurring her words, making deliberated movements, her balance unsteady, and her inability to log on to the computer system. Respondent

5

1  was instructed to complete a drug screening, which later confirmed that Respondent tested

2  positive for Benzodiazepine in her system.

3       19.   On July 21, 2015, Respondent met with a Board investigator and was shown a report

4  of her obtaining significant amounts of controlled substances through prescriptions. Respondent

5  admitted to using Norco to alleviate her acute pain caused by her neck injury and past breast

6  surgery and Valium to manage her anxiety. When the Board investigator questioned what

7  controlled substances she consumed the night before her December 31, 2014 shift, she admitted

8  that she took a single Valium tablet at approximately 1800 hours and two nights prior, she took a

9  single Norco tablet. At the conclusion of the interview, Respondent was requested to submit to a

10  drug screening. Respondent tested positive for Hydrocodone and Oxycodone.

11       20.   The review of Medical Record# 1136316 of a 74 year old critically ill female with an

12  acute, abdomen, secondary to bowel perforation, revealed that her physician ordered Dilaudid 0.5

13  mg at 0756 and an additional dose in 30 minutes on April 1, 2014. There was also an additional

14  order on April 1, 2014 for Dilaudid 0.5 mg IV Q3hrs PRN for pain by another ICU physician.

15  Respondent documented at 1034 that she gave patient Dilaudid 0.5 mg IVP at 0805 from a 1

16  mg/1ml syringe. Her initial contact with the patient at 0900 was documented at 1136. Respondent

17  charted patient's vital signs for 1000 at 1153, the vital signs for 1030 hour were charted at 1348.

18  At 1154, Respondent documented that "md (B) ICU intensivist here to see patient." There was

19  little documentation on this critical patient and most of the documentation was post timed.

20       21.   On April 1, 2014, at 0937, the Omnicell report for Medical Record# 1136316 showed

21  Respondent removed 1 mg Dilaudid. At 1854 Respondent recorded a witnessed waste of 1mg

22  Dilaudid, almost nine hours later.

23       22.   The review of Medical Record# 1191394 revealed that the 64 year old male patient

24  with agonal respirations and septic shock was admitted to the Emergency Department on April 1,

25  2014. At 1614 there was a physician's order to infuse Vancomycin 1 gram IVPB in over 1.5

26  hours. At 1712, Respondent administered Vancomycin 1 gram to patient at twice the prescribed

27  rate as noted by preceptee.

28

( VERONICA FLORES) ACCUSATION

23.   The review of Medical Record# 0321924 revealed a male with a history of recurrent syncope. He was diagnosed with Orthostatic syncope. There is no documentation by Respondent on this patient. There is a statement by Dr. B.G. in the records dated April 16, 2014, that it is not his practice to provide oral Dilaudid in the Emergency Department and he would not prescribe Dilaudid to an elderly man with syncope. On April 1, 2014, at 0912, Respondent removed Dilaudid 2mg tablet for this patient and there was no documentation of administration or waste witnessed/recorded.

## FIRST CAUSE FOR DISCIPLINE

### (Gross Negligence)

24.   Respondent is subject to disciplinary action Code section 2761, subdivision (a)(1), in conjunction with California Code of Regulations, title 16, section 1442, on the grounds of unprofessional conduct, in that on or about April 1, 2014, while employed as a registered nurse at SJMC, Respondent committed gross negligence by:

(a) Removal of Dilaudid, a controlled substance from Omnicell and failure to document administration or wastage on patient MR# 0321924.

(b) Removal of multiple doses of Dilaudid, a controlled substance, for patient MR# 1136316 and failure to document administration or wastage.

(c) Administration of Vancomycin 1 gram to patient MR# 1191394 at twice the prescribed rate as noted by preceptee at 1712 on April 1, 2014. During or soon after rapid infusion of Vancomycin, patients may develop anaphylactoid reactions, including hypotension, wheezing, dyspnea, urticaria, or pruritus. Rapid infusion may also cause flushing of the upper body ("red neck") or pain and muscle spasms of the chest and back. These reactions usually resolve within 20 minutes buy may persist for several hours.

(d) Consuming controlled substance prescribed or not which impairs Respondent's ability to conduct with safety to the public the practice authorized by a Registered Nurse licensure.

25.   Complainant refers to and incorporates all the allegations contained in paragraphs 16 through 23, as though set forth fully.

7

**SECOND CAUSE FOR DISCIPLINE**

**(Unprofessional Conduct: Illegally Obtained or Possessed Controlled Substances)**

26.    Respondent is subject to disciplinary action under Code section 2762, subdivision (a), for unprofessional conduct, in that on or about April 1, 2014, while employed as a Registered Nurse at SJMC, Respondent committed unprofessional conduct by withdrawing Dilaudid, a controlled substance, from the Omnicell and failure to document administration or wastage on patient MR# 0321924, and withdrawing multiple doses of Dilaudid for patient MR# 1136316 and failure to record administration to the patient or wastage.

27.    Complainant refers to and incorporates all the allegations contained in paragraphs 16 through 23, as though set forth fully.

**THIRD CAUSE FOR DISCIPLINE**

**(Unprofessional Conduct: Falsify, Make Grossly Incorrect, or Inconsistent Entries)**

28.    Respondent is subject to disciplinary action under Code section 2761, subdivision (a), and 2762, subdivision (e), for unprofessional conduct, in that on or about April 1, 2014, while employed as a Registered Nurse at SJMC, Respondent falsified, or made grossly incorrect or grossly inconsistent entries in the patient's AVH chart notes and/or Medication Administration Record (MAR) pertaining to controlled substances and dangerous drugs, by withdrawing Dilaudid, a controlled substance, from Omnicell and failure to document administration or wastage on patient MR# 0321924, and withdrawing multiple doses of Dilaudid for patient MR# 1136316 and failure to record administration to the patient or wastage.

29.    Complainant refers to and incorporates all the allegations contained in paragraphs 16 through 23, as though set forth fully.

**FOURTH CAUSE FOR DISCIPLINE**

**(Unprofessional Conduct: Using Controlled Substances which impairs Respondent's ability to conduct with safety to the public the practice authorized by a Registered Nurse licensure)**

30.    Respondent is subject to disciplinary action under Code section 2762, subdivision (b), for unprofessional conduct, in that on or about April 1, 2014, while employed as a Registered

8

1 | Nurse at SJMC, Respondent consumed controlled substance prescribed or not which impaired her

2 | ability to conduct with safety to the public the practice authorized by a Registered Nurse

3 | licensure.

4 |     31.    Complainant refers to and incorporates all the allegations contained in paragraphs 16

5 | through 23, as though set forth fully.

6 | **FIFTH CAUSE FOR DISCIPLINE**

7 | **(Unprofessional Conduct: Using Controlled Substances which impairs Respondent's**

8 | **ability to conduct with safety to the public the practice authorized by a Registered Nurse**

9 | **licensure)**

10 |     32.    Respondent is subject to disciplinary action under Code section 2762, subdivision

11 | (b), for unprofessional conduct, in that on or about December 31, 2014, while employed as a

12 | Registered Nurse at SJMC, Respondent consumed controlled substances prescribed or not which

13 | impaired her ability to conduct with safety to the public the practice authorized by a Registered

14 | Nurse licensure.

15 |     33.    . Complainant refers to and incorporates all the allegations contained in paragraphs

16 | 18 through 19, as though set forth fully.

17 | **PRAYER**

18 |     WHEREFORE, Complainant requests that a hearing be held on the matters herein alleged,

19 | and that following the hearing, the Board of Registered Nursing issue a decision:

20 |     1.    Revoking or suspending Registered Nurse License Number 670536, issued to

21 | Veronica Flores

22 |     2.    Ordering Veronica Flores to pay the Board of Registered Nursing the reasonable costs

23 | of the investigation and enforcement of this case, pursuant to Business and Professions Code

24 | section 125.3; and,

25 | ///

26 | ///

27 | ///

28 | ///

9

3.    Taking such other and further action as deemed necessary and proper.

DATED:  April 11, 2018

JOSEPH L. MORRIS, PHD, MSN, RN
Executive Officer
Board of Registered Nursing
Department of Consumer Affairs
State of California
*Complainant*

LA2016601802
52652325.docx

10

( VERONICA FLORES) ACCUSATION
00035

# EXHIBIT B

Filed 10/22/19  Flores v. Dignity Health CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| VERONICA FLORES,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>DIGNITY HEALTH,<br><br>    Defendant and Respondent. | 2d Civil No. B294776<br>(Super. Ct. No. 56-2018-00507606-CU-WT-VTA)<br>(Ventura County) |

   Veronica Flores, a registered nurse, appeals from the judgment entered after the trial court sustained respondent Dignity Health's demurrer without leave to amend.[1]  Respondent

_____

   [1] Appellant's notice of appeal states that she is appealing from both the judgment and an "Order Denying Motion for New Trial."  "[I]t has long been settled that an order *denying* a motion for new trial is not independently appealable and may be reviewed only on appeal from the underlying judgment. [Citation.]"  (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 19.)

was appellant's employer.  After respondent discharged appellant, she brought the present action alleging that the discharge was in retaliation for "asserting the right to work in a safe environment with proper ratios between nurses and patients."  The trial court concluded that the present action is preempted by the federal National Labor Relations Act (NLRA or Act).  (29 U.S.C. § 151 et seq.)  We affirm.

*Factual and Procedural Background*

Starting in October 1994, respondent employed appellant as a nurse at a hospital in Oxnard.  Her employment was pursuant to a collective bargaining agreement (CBA).

In April 2015 respondent discharged appellant.  "Service Employees International Union Local 21 (SEIU) initiated on [appellant's] behalf a grievance pursuant to the collective bargaining agreement . . . for unjust termination of her employment [in violation of the CBA] . . . ."

Pursuant to the NLRA, in October 2015 appellant filed an unfair labor practice charge with the National Labor Relations Board (NLRB or Board).  The charge stated that respondent had "discharged union steward Veronica Flores . . . in retaliation for her union and/or concerted protected activity."  The charge does not describe the nature of the protected activity.

The NLRB deferred "further proceedings on the charge . . . to the grievance/arbitration process."  The NLRB explained:  "The Board's deferral policy provides that the Board will postpone making a final determination on a charge when a grievance involving the same issue can be processed under the grievance/arbitration provision of the applicable contract."  "Since the issues in the charge appear to be covered by provisions of the collective-bargaining agreement, it is likely that the issues may

2

be resolved through the grievance/arbitration procedure."
"[W]hile the charge is deferred, the Regional office [of the NLRB]
will monitor the processing of the grievance and, under certain
circumstances, will resume processing of the charge."  "[A]t any
time, a party may present evidence and request dismissal of the
charge, continued deferral of the charge, or issuance of a
complaint."

The grievance initiated by SEIU, but not the unfair labor
practice charge filed by appellant with the NLRB, proceeded to
arbitration.  In August 2017, the arbitrator concluded that
respondent "has proven it had just cause to impose a disciplinary
suspension but not that it had just cause to discharge
[appellant]."  The arbitrator observed that respondent had
"justified its decision to discharge [her] based on the grounds that
[she] had been at work 'under the influence' on April 1 and again
on December 31, 2014."  The evidence did not support a finding
that she was under the influence on April 1, 2014, although a
drug test "showed metabolites of the prescribed Xanax."  But
"[t]he story is very different on December 31, 2014 where the
multiple incidents reported by her co-workers prove[] that she
was impaired. . . .  Coming to work knowing she was impaired is
a clear violation of a known Policy and is a serious enough
violation to be just cause for the disciplinary suspension."  The
arbitrator ordered respondent to "reinstate [appellant] . . . if an
evaluation by a mutually agreed upon drug treatment
specialist . . . determines that she is able to work unimpaired by
her medications."

The arbitrator did not consider the unfair labor practice
charge that appellant had filed with the NLRB.  The arbitrator
stated:  "I note that the parties told me there was a deferred

3

Unfair Labor Practice Charge, but I was provided neither the Charge nor a deferral letter.  Although there is evidence that [appellant] was a Union Steward and filed complaints . . . about quite a few RN [registered nurse] assignments over the years, except for one statement from an exasperated supervisor, there is no other evidence in this record of union bias related to the matters here in issue."

Respondent mistakenly asserts that the unfair labor practice charge "was ultimately resolved in arbitration" and that the arbitrator "concluded there was no evidence of retaliation." The arbitrator's decision does not mention appellant's complaints about inadequate nurse-to-patient ratios.  Nor does it mention her claim that she was discharged in retaliation for making these complaints.

In May 2018, the United States District Court for the Central District of California dismissed appellant's petition to confirm the arbitration award.  The court reasoned that appellant lacked standing to file the petition because she was not a party to the arbitration and the CBA did not permit her to submit a dispute to arbitration.

In June 2018 appellant filed in Ventura County Superior Court a first amended complaint (complaint) in the present matter.  The complaint consists of two causes of action.  The first alleges that, in violation of section 1278.5 of the Health and Safety Code,[2] respondent retaliated against appellant for

_____

[2] All further statutory references are to the Health & Safety Code.

"whistleblowing."[3]  Appellant "repeatedly complained of insufficient staffing for the number of patients."  "As a result of [her] safety complaints, [respondent] retaliated against her."  She "was forced to endure continued harassment."  The retaliation eventually resulted in the termination of her employment in April 2015.  "[Appellant] had never been subjected to discipline in any form by [respondent] until after she made complaints

---

[3] Section 1278.5, subdivision (b)(1)(A) provides, "No health facility shall discriminate or retaliate, in any manner, against any patient, employee, member of the medical staff, or any other health care worker of the health facility because that person has . . . [p]resented a grievance, complaint, or report to the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical staff of the facility, or to any other governmental entity."  This statute is known as "the health care facility whistleblower statute."  (*Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 667.)  Section 1278.5, subdivision (a) states, "The Legislature finds and declares that whistleblower protections apply primarily to issues relating to the care, services, and conditions of a facility and are not intended to conflict with existing provisions in state and federal law relating to employee and employer relations."  The statute "'prohibits retaliation against any employee who complains to an employer or a government agency about unsafe patient care or conditions.'  [Citation.]  To establish a prima facie case of retaliation under § 1278.5, a plaintiff must show that: (1) he engaged in protected activity under the statute; (2) he was thereafter subjected to an adverse employment action; and (3) a causal link between the two."  (*Jadwin v. County of Kern* (E.D. Cal. 2009) 610 F.Supp.2d 1129, 1144.)

5

regarding proper nurse to patient ratios and the patient safety concerns arising from improper ratios."[4]

The second cause of action was for "wrongful termination in violation of public policy."  Both causes of action sought "[c]ompensatory damages for lost wages and benefits," "[e]motional distress damages," and punitive damages.  The first cause of action also sought "[p]enalties in the sum of $20,000 per willful violation."

After granting "the requests of both parties for judicial notice of certain" documents, the trial court sustained respondent's demurrer without leave to amend.  The court ruled that appellant's state "claims . . . are preempted by sections 7 and 8 of the NLRA."  Judgment was entered in respondent's favor.

Appellant filed a motion for a new trial on the ground that "there is insufficient evidence to support the order granting the demurrer to the complaint without leave to amend . . . and that the finding of NLRA preemption is against the law."  The court denied the motion.

### Demurrer; Standard of Review

"The task of this court is to determine whether the complaint states a cause of action."  (*Inter-Modal Rail Employees Assn. v. Burlington Northern & Santa Fe Railway Co.* (1999) 73 Cal.App.4th 918, 924 (*Inter-Modal*).)  A demurrer "'test[s] the sufficiency of the [pleading] as a matter of law, and it raises only a question of law.  [Citations.]  On a question of law, we apply a de novo standard of review on appeal.' [Citation.]  [¶]  The

---

[4] In her opening brief, appellant states that "the controversy in this action is . . . whether Respondent terminated Appellant's employment because she complained of unlawful staffing risking patient safety in violation of H&S Code § 1278.5."

6

reviewing court gives the pleading a reasonable interpretation and treats the demurrer as admitting all material facts properly pleaded.  [Citation.]"  (*First Aid Services of San Diego, Inc. v. California Employment Development Dept.* (2005) 133 Cal.App.4th 1470, 1476 (*First Aid Services*).)  "''We also consider matters which may be judicially noticed.' [Citation.] . . ." (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.)  "The reviewing court does not . . . assume the truth of contentions, deductions or conclusions of law.  [Citation.]"  (*First Aid Services, supra,* at p. 1476.)

"'The judgment [sustaining a demurrer] must be affirmed "if any one of the several grounds of demurrer is well taken. [Citations.]" [Citation.]  However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory.  [Citation.]  And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment. [Citation.]' [Citation.]"  (*First Aid Services, supra,* 133 Cal.App.4th at pp. 1476-1477.)

<em>Preemption under Sections 7 and 8 of the NLRA</em>

"Section 7 of the NLRA guarantees employees 'the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and *to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .*' (29 U.S.C. § 157.)  Section 8 of the NLRA makes it an unfair labor practice for an employer 'to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in' section 7.  (29 U.S.C. § 158(a)(1).)"  (*Luke v.*

7

*Collotype Labels USA, Inc.* (2008) 159 Cal.App.4th 1463, 1469-1470 (*Luke*), italics added.)

"Whether the NLRA preempts a cause of action is an issue of law we review de novo. [Citation.]" (*Wal-Mart Stores, Inc. v. United Food & Commercial Workers International Union* (2016) 4 Cal.App.5th 194, 201.) "The strand of federal preemption under the NLRA relevant to this case was announced by the United States Supreme Court in *San Diego Unions v. Garmon* (1959) 359 U.S. 236 . . . (*Garmon*). Under the *Garmon* test, state law claims are preempted if they concern conduct that is 'arguably' protected by section 7 or 'arguably' prohibited by section 8 of the NLRA. (*Garmon, supra,* at p. 245.)[5] . . . [¶] The scope of preemption based on conduct that is arguably protected by the NLRA does not extend to state law claims where the activity regulated (1) is a 'merely peripheral concern' of the NLRA (*Garmon, supra,* 359 U.S. at p. 243) or (2) 'touches on interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, it could not be inferred that Congress intended to deprive the State of the power to act.' [Citations.]" (*Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 632-633 (*Haney*); see also *Farmer v. United Brotherhood of Carpenters and Joiners of America, Local 25* (1977) 430 U.S. 290, 302 (*Farmer*) ["inflexible application of the [*Garmon* preemption] doctrine is to be avoided, especially where the State has a

---

[5] "When an activity is arguably subject to [section] 7 or [section] 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." (*Garmon, supra,* 359 U.S. at p. 245.)

8

substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme"].)  "[T]he local interest exception is founded upon a recognition that certain conduct can be the basis for state court action even though the same conduct might constitute an unfair labor practice under the [Act]. [Citation.]"  (*Hillhaven Oakland Nursing etc. Center v. Health Care Workers Union* (1996) 41 Cal.App.4th 846, 859, (*Hillhaven Oakland Nursing*), fn. omitted.)

*Appellant's State Court Action is*
*Preempted by Sections 7 and 8 of the NLRA*
<u>Appellant Engaged in Arguably Protected Conduct that</u>
<u>Is Not A Merely Peripheral Concern of the NLRA</u>

"The [NLRB] has jurisdiction to investigate unfair labor practices, which include discharges based on protected activity such as voicing safety complaints . . . ."  (*Zurn Industries, Inc. v. N.L.R.B.* (9th Cir. 1982) 680 F.2d 683, 694.)  Appellant's complaint in the state court action alleges that, "in[] terminating [her] employment, [respondent] retaliated against [her] for asserting the right to work in a safe environment with proper ratios between nurses and patients."  But appellant's complaints to her employer concerned the safety of the patients, not the nurses.  "The Board has held repeatedly that employee concerns for the 'quality of care' and the 'welfare' of their patients are not interests 'encompassed by the "mutual aid or protection" clause'" of section 7 of the NLRA.  (*Orchard Park Health Care Center, Inc.* (2004) 341 N.L.R.B. 642, 643-644.)  Therefore, to the extent that appellant's complaints concerned the safety of patients, they do not qualify as protected activity under the NLRA.  (*Ibid*.; see *Good Samaritan Hospital* (1982) 265 N.L.R.B. 618, 626

9

[employees' criticisms of "the quality of care . . . and the welfare of the children . . . were not directed to improve their lot as employees . . . .  As such, [the] criticisms [were] related to disputes outside the objectives of the mutual aid or protection provisions [of section 7] of the National Labor Relations Act"].)

Nevertheless, appellant's protests against inadequate nurse-to-patient ratios arguably constitute protected activity because they related not only to patient safety, but also to the working conditions of the nurses.  "'[T]he policy of the Act [is] to protect the right of workers to act together to better their working conditions.'"  (*Eastex, Inc. v. N.L.R.B.* (1978) 437 U.S. 556, 567.)  "Employee protests to improve working conditions have long been held protected activity . . . ."  (*PHT, Inc. v. N.L.R.B.* (D.C. Cir. 1990) 920 F.2d 71, 73.)  In *Misericordia Hospital Medical Center v. N.L.R.B.* (2d Cir. 1980) 623 F.2d 808, 812-813 (*Misericordia Hospital*), the court concluded that a nurse's participation in the preparation of a report criticizing nursing staff shortages was protected activity "that related not only to patient welfare but to the working conditions of the employees; indeed, in the health care field such issues often appear to be inextricably intertwined."  Thus, the nurse's discharge for her participation in preparing the report was an unfair labor practice.  (See also *Community Hospital of Roanoke Valley, Inc. v. N.L.R.B.* (4th Cir. 1976) 538 F.2d 607, 609-610 [hospital committed unfair labor practice by disciplining nurse because she complained on television about "hospital working conditions regarding staffing"; her complaint was protected activity under section 7 of the NLRA]; *Washington State Nurses Ass'n v. N.L.R.B.* (9th Cir. 2008) 526 F.3d 577, 582 ["'[w]hether a button [worn by a nurse] protests "forced overtime" or demands

"safe staffing," both messages obviously relate to the impact of inadequate staffing levels on the hours [nurses] are required to work and the conditions they labor under.' [Citation.]  Consistent with this view, both the courts and the Board have long recognized that nurses' working conditions are directly related to patient care and safety"].)

Appellant's claim that respondent discharged her in retaliation for complaining about insufficient staffing is not a "'merely peripheral concern' of the NLRA." (*Haney*, *supra*, 121 Cal.App.4th at p. 633.)  "[W]orking conditions are of central, not peripheral, concern to the NLRA's purposes. . . .  [T]he NLRA specifically sought to protect the right of employees to organize to improve their working conditions." (*Henry v. Laborers' Local 1191* (2014) 495 Mich. 260, 290 [848 N.W.2d 130, 146].)

<u>Appellant Engaged in Arguably Concerted Activities</u>

"To be within the ambit of [section 7 of] the NLRA, the [employee's] action must be 'concerted' . . . ." (*Mayes v. Kaiser Foundation Hospitals* (E.D.Cal. 2013) 917 F.Supp.2d 1074, 1082 (*Mayes*).)  Appellant claims that the NLRA does not preempt state law because she acted alone.  "An individual employee's complaint is 'concerted' if it is related to group action for the mutual aid or protection of other employees.  [Citation.]  Either the individual employee 'is in fact acting on behalf of, or as a representative of, other employees,' [citation], or his claim 'must be made with the object of inducing or preparing for group action,' [citation].  It is not necessary that the individual employee be appointed or nominated by other employees to represent their interests.  [¶]  Protests of . . . working conditions and the presentation of job-related grievances are for the mutual aid and protection of employees.  [Citations.]  Additionally, an

00087

employee's presentation of job-related grievances aimed at achieving employer compliance with governmental regulations affecting working conditions is for the mutual aid and protection of employees.  [Citations.]"  (*N.L.R.B. v. Lloyd A. Fry Roofing Co., Inc. of Delaware* (6th Cir. 1981) 651 F.2d 442, 445; see also *Ewing v. N.L.R.B.* (2d Cir. 1988) 861 F.2d 353, 361 ["a lone act is concerted . . . if an individual acts, formally or informally, on behalf of a group"]; *N.L.R.B. v. Main Street Terrace Care Center* (6th Cir. 2000) 218 F.3d 531, 539 ["The relevant inquiry in determining whether an employee's action was concerted . . . 'is whether the employee acted with the purpose of furthering group goals'"].)

Appellant's complaints about insufficient staffing arguably constitute "concerted activities" within the meaning of section 7 of the NLRA.  It is reasonable to infer that she made the complaints for the purpose of furthering a group goal – the improvement of working conditions by increasing the allegedly inadequate ratio of nurses to patients.  It is also reasonable to infer that she acted on behalf of herself and other nurses at the hospital.  (See *Haney*, *supra*, 121 Cal.App.4th at p. 635 [concerted activity issue "raises the question whether . . . Haney arguably acted on behalf of a group"].)  Appellant would not be the only beneficiary of an increase in nursing staff.  The other nurses would also benefit because their workloads would be reduced.  (See *Misericordia Hospital*, *supra*, 623 F.2d at p. 813 [report on nursing staff shortage "raised issues that related . . . to the working conditions of the employees"].)

The allegedly insufficient staffing level not only imposed an unreasonable burden on nurses; it also violated state regulations.  Appellant asserted that she "was repeatedly required to work

with insufficient staff, which insufficiency violated the legally mandated ratio of nurses to patients, which short staffing was a patient safety violation."  "Patient ratios required by California law are a 1 to 1 ratio between nurse and patient in '5150' patient suicide-concerns situations and frequently the ratio [at the hospital] has instead been 2 or 3 patients per nurse."[6]  In *Mayes*, *supra*, 917 F.Supp.2d at p. 1085, the court concluded that a nurse's request for "an audit . . . which might have [shown] a lower licensed nurse-to-patient ratio than permitted by law . . . was a concerted activity about working conditions."  The court continued, "Despite plaintiff's characterization of [his] claim as relating to patient safety, his complaint is properly viewed as concerted activity for mutual aid and protection such that his termination was an unfair labor practice."  (*Ibid*.)

Furthermore, appellant was not just respondent's employee; she was also a union steward.  In her unfair labor practice charge filed with the NLRB, appellant admitted that she had engaged in concerted activities as a union steward.  The charge stated:  "[Respondent] discharged union steward Veronica Flores . . . in retaliation for her union and/or *concerted* protected activity."  (Italics added.)  In her opening brief, appellant claims that she "asserts in the NLRB complaint that the motivation for her retaliatory termination was her *concerted* activity as a union steward in representing and advising other employees."  (Italics added.)  "Union steward" is defined as "[a] union official who

_____

[6] Section 1276.4 requires the State Department of Public Health to "adopt regulations that establish minimum, specific, and numerical licensed nurse-to-patient ratios by licensed nurse classification and by hospital unit for all health facilities licensed pursuant to subdivision (a), (b), or (f) of Section 1250."

represents union employees and who oversees the performance of union contracts."  (Black's Law Dict. (9th ed. 2009) p. 1549, col. 2.)  Since appellant was a union steward, it is reasonable to infer that, when she complained about inadequate staffing levels, she was acting on behalf of the nurses that she represented.  (See *Mayes*, *supra*, 917 F.Supp.2d at p. 1083 ["Plaintiff's actions as a union representative were concerted within the meaning of the NLRA"]; *Londono v. ABM Janitorial Services* (D.N.J. Dec. 12, 2014) No. CIV.A. 13-3539 ES,  2014 U.S. Dist. LEXIS 172475 at *16-17 ["As a shop steward, Londono undoubtedly could have shown that she engaged in protected concerted activity under the NLRA when she complained of an alleged violation of law affecting all employees and was then terminated in retaliation, in violation of sections 7 and 8 of the NLRA"]; *Id.*, 2014 U.S. Dist. LEXIS 172475 at *17 ["the law does not stand for the proposition that a[] shop steward can complain to management in an individual capacity in order to avoid NLRA preemption"].)

<u>The Local Interest Exception to *Garmon*</u>
<u>Preemption Is Inapplicable</u>

The remaining issue is whether "the activity regulated . . . 'touches on interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, it could not be inferred that Congress intended to deprive the State of the power to act.'  [Citations.]"  (*Haney*, *supra*, 121 Cal.App.4th at p. 633.)  As an example of activity that touches on deeply rooted local interests, the *Haney* court noted in dicta that "workers' claims for wrongful discharge in retaliation for complaining about unsafe work conditions are not preempted by the NLRA."  (*Ibid.*, fn. 3.)  In support of its statement, the

court cited *Paige v. Henry J. Kaiser Co.* (9th Cir. 1987) 826 F.2d
857 (*Paige*), and *Inter-Modal*, *supra*, 73 Cal.App.4th at p. 924.

In *Paige* the plaintiffs brought an action against their
employer for wrongful discharge in violation of public policy.  The
plaintiffs claimed that they had been discharged for complaining
about unsafe working conditions in violation of the California
Occupational Safety and Health Act (Cal/OSHA).  The court
rejected the employer's argument that *Garmon* preempted the
wrongful discharge claim.  It reasoned:  "Congress's main goal in
enacting the NLRA was to establish an equitable bargaining
process . . . .  State laws which set minimum safety standards do
not interfere with the bargaining process itself." (*Paige*, *supra*,
826 F.2d at pp. 863-864.)  "Cal/OSHA and actions for wrongful
discharge in violation of Cal/OSHA do not interfere with the
bargaining process.  As it is uniquely within the states' police
powers to legislate for the health and safety of their citizens, and
such regulation does not interfere with the NLRA's goals, federal
law does not preempt such statutes." (*Id.* at p. 865.)

In *Inter-Modal* an employees' association filed a complaint
alleging that the defendant employers had terminated employees
for complaining about unsafe working conditions in violation of
Cal/OSHA.  The trial court granted the defendants' motions for
judgment on the pleadings because the plaintiff's "wrongful
termination claims were 'committed by federal law to the
exclusive jurisdiction of the National Labor Relations Board.'"
(*Inter-Modal*, *supra*, 73 Cal.App.4th at p. 923.)  Relying on *Paige,*
the Court of Appeal concluded that the trial court had "erred in
finding federal preemption of [the plaintiff's] health and safety
claims because the court ignored the exception for local concerns."
(*Id.* at p. 925.)  The Court of Appeal rejected the defendants'

claim that "federal preemption occurred because [plaintiff] *could have* presented its claims to the NLRB." (*Id*. at p. 927.)

*Paige* and *Inter-Modal* are distinguishable. The present state court action does not involve complaints about unsafe working conditions in violation of Cal/OSHA. (See *Luke*, *supra*, 159 Cal.App.4th at p. 1473 ["where the public policy at issue involves employee complaints under, or refusal to violate, state occupational safety and health laws, causes of action for wrongful termination in violation of this public policy are not preempted"].) Although the allegedly inadequate nurse-to-patient ratio adversely affected the nurses' working conditions by increasing their workload, it did not adversely affect their health or safety. The state regulations establishing minimum nurse-to-patient ratios were designed to protect the health and safety of patients, not nurses.

*Paige and Inter-Modal* are also distinguishable because the plaintiffs in these cases could have, but did not, file an unfair labor practice charge with the NLRB. Here, in contrast, appellant's union invoked the jurisdiction of the NLRB by filing an unfair labor practice charge before she filed her state court action.

"To determine whether regulated conduct touches interests deeply rooted in local feeling and responsibility such that state law is not preempted, a court must first consider whether there is 'a significant state interest in protecting the [employee] from the challenged conduct.' [Citation.] Second, it must consider the level of 'risk of interference with the regulatory jurisdiction of the Labor Board.' [Citation.] Once those two considerations have been measured, the court must balance them against each other before ultimately concluding whether the state law is preempted.

[Citation.]" (*Pia v. URS Energy & Construction, Inc.* (S.D. Iowa 2017) 227 F.Supp.3d 999, 1003 (*Pia*); see *Kaufman v. Allied Pilots Ass'n* (5th Cir. 2001) 274 F.3d 197, 201 ["The [United States Supreme] Court has explicitly rejected a formalistic implementation of *Garmon,* and invited a balancing of state interests and federal regulatory interests in analyzing the preemption question"]; *Allis-Chalmers Corp. v. Lueck* (1985) 471 U.S. 202, 214, fn. 9 ["So-called *Garmon* pre-emption involves protecting the primary jurisdiction of the NLRB, and requires a balancing of state and federal interests"]; *Local 926, International Union of Operating Engineers, AFL-CIO v. Jones* (1983) 460 U.S. 669, 676 ["The question of whether [state] regulation should be allowed because of the deeply rooted nature of the local interest involves a sensitive balancing of any harm to the regulatory scheme established by Congress, either in terms of negating the Board's exclusive jurisdiction or in terms of conflicting substantive rules, and the importance of the asserted cause of action to the State as a protection to its citizens"].)

California has a significant interest in protecting hospital employees from being discharged in retaliation for complaining about a low nurse-to-patient ratio that allegedly violates state regulations and threatens patient safety. "Next, this Court must determine the level of the 'risk of interference with the regulatory jurisdiction' of the National Labor Relations Board . . . if the state-law claim were to proceed. [Citation.] Because the level of risk is highly case-dependent, this determination 'requires a more fact-sensitive approach.' [Citation.]" (*Pia, supra,* 227 F.Supp.3d at p. 1004.) "The critical inquiry . . . is . . . whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been, but was not,

presented to the Labor Board.  For it is only in the former situation [i.e., identical controversies] that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the *Garmon* doctrine was designed to avoid." (*Sears*, *Roebuck & Co. v. San Diego County Dist. Council of Carpenters* (1978) 436 U.S. 180, 197 (*Sears*).)

The controversies here are identical.  The union's unfair labor practice charge did not indicate the nature of the protected activity for which she had been discharged.  But based on appellant's complaint in the state court action, the protected activity consisted of her protests against allegedly unsafe nurse-to-patient ratios.  The complaint stated, "In terminating [appellant's] employment, [respondent] retaliated against [her] for asserting the right to work in a safe environment with proper ratios between nurses and patients . . . ."  Thus, the issues in the state court action cannot be decided without resolving the merits of the unfair labor practice charge filed with the NLRB.

In her opening brief, appellant acknowledges that both the unfair labor practice charge and the state court action "are based on the termination" of her employment.  But she claims that "the controversies are not identical."  Appellant notes, "[T]he controversy in [the state court] action is . . . whether Respondent terminated Appellant's employment because she complained of unlawful short-staffing unduly risking patient safety."  Appellant does not explain why the unfair labor practice charge is based on a different controversy.  In her reply brief appellant contends that the controversies are not identical because, unlike the state court action, "[i]n the NLRB action, the retaliation for complaints of insufficient staffing must be motivated by the intention to

restrain and coerce Appellant from exercising rights to concerted activity . . . ."  Appellant does not explain why the unfair labor practice charge requires such a motivation.

In *Sears* the United States Supreme Court said, "The critical inquiry . . . is . . . whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been, *but was not*, presented to the Labor Board." (*Sears*, *supra*, 436 U.S. at p. 197, italics added.)  It is important that here the controversies are not only identical; the state court controversy *was* presented to the NLRB before appellant filed her complaint in the state court action.  The NLRB decided to invoke its "deferral policy," which "provides that the Board will *postpone* making a final determination on a charge when a grievance involving the same issue can be processed under the grievance/arbitration provision of the applicable contract." (Italics added.)  The NLRB retained jurisdiction over the matter. "[D]eferral is not akin to abdication [by the NLRB].  It is merely the prudent exercise of restraint, a postponement of the use of the Board's processes to give the parties' own dispute resolution machinery a chance to succeed." (*United Technologies Corp.* (1984) 268 N.L.R.B. 557, 560.)  "[W]here, after deferral, the respondent has refused to proceed to arbitration, the Board has rescinded the deferral and decided the case on the merits." (*Ibid*.)

The arbitrator did not consider the unfair labor practice charge because appellant did not properly bring the charge before the arbitrator.  The arbitrator stated:  "I note that the parties told me there was a deferred Unfair Labor Practice Charge, but I was provided neither the Charge nor a deferral letter."  Instead of

arbitrating the charge, appellant recast it as a state law claim and filed the present court action.

At oral argument in this court, appellant's counsel said that the charge is still pending before the NLRB.  In these circumstances, "'[t]he risk of interference with the Board's jurisdiction is . . . obvious and substantial.'"  (*Platt v. Jack Cooper Transport*, *Co.*, *Inc.* (8th Cir. 1992) 959 F.2d 91, 95 (*Platt*) ["'The risk of interference with the Board's jurisdiction is . . . obvious and substantial' when an unsuccessful charge to the Board is recast as a state law claim"].)  The NLRB did not authorize appellant to skip the arbitration process and instead file a state court action based on the unfair labor practice charge.

"To permit the state law claim . . . to proceed in this situation is to permit the risk of inconsistent results between [the trial court] and the NLRB."  (*MVM Inc. v. Rodriguez* (D.P.R. 2008) 568 F.Supp.2d 158, 174; see also *Rodriguez v. Yellow Cab Cooperative*, *Inc.* (1988) 206 Cal.App.3d 668, 679 ["Because appellant's state claim might result in regulation of conduct arguably within the jurisdiction of the NLRB there is 'a realistic threat' that a state judicial proceeding would impinge on 'the federal regulatory scheme"].)  Moreover, "the infringement on federal labor policy would be substantial because the state claim presented is inextricably intertwined with federal labor law."  (*MVM Inc.*, *supra*, at p. 174.)  Balancing the state interest against the risk of interference with the regulatory jurisdiction of the NLRB, "we conclude that [appellant's] state law claims are preempted by the NLRA as construed in *Garmon* and its

20

00096

progeny."[7]  (*Platt*, *supra*, 959 F.2d at p. 95; see also *Farmer*, *supra*, 430 U.S. at p. 305 ["concurrent state-court jurisdiction cannot be permitted where there is a realistic threat of interference with the federal regulatory scheme"].)

The preemption of appellant's whistleblower claim is supported by the recent Ninth Circuit memorandum opinion in *Casumpang v. Hawaiian Commercial & Sugar Co.* (9th Cir. 2018) 712 Fed.Appx. 709 (*Casumpang*).[8]  There, the Court of Appeals concluded, "The district court did not err in holding Casumpang's Hawaii Whistleblower Protection Act claims against [his former employer] are preempted by the National Labor Relations Act . . . under . . . [*Garmon*] . . . and its progeny."  (*Id*. at p. 710.)  The appellate court explained:  "The local interest exception to *Garmon* preemption does not apply.  Casumpang's state law claim was substantially the same as his unfair labor practice charge against [his former employer] alleging his employer retaliated against him for filing grievances and reporting safety concerns.  Because '[t]he risk of interference with the Board's jurisdiction is . . . obvious and substantial' when the same issues brought to the National Labor Relations Board are raised in a state court complaint, Casumpang cannot 'relitigate the question' under state law.  [Citations.]"  (*Id*. at pp. 710-711.)

---

[7] Because the state action is preempted by the NLRA, we need not consider respondent's contention that appellant's state claims are time-barred.

[8] The opinion states that it "is not appropriate for publication and is not precedent."  (*Casumpang*, *supra*, 712 Fed.Appx. at p. 709.)  Pursuant to Ninth Circuit Rule 36-3(b) and rule 32.1(a) of the Federal Rules of Appellate Procedure, the opinion may be cited for its persuasive value.

We recognize that, unlike Casumpang, in her state court action appellant is not relitigating issues raised in her unfair labor practice charge.  These issues were never litigated because the NLRB "postpone[d] making a final determination" pending the outcome of the arbitration proceedings, and the arbitrator did not determine the merits of the unfair labor practice charge.  But the existence of the unresolved charge raises a serious risk of conflicting decisions.  "Cases following *Garmon* have clarified that the preemption issue as to both arguably prohibited and arguably protected conduct 'turns primarily on whether preemption is necessary to avoid conflicting adjudications which would interfere with the regulatory activity of the administrative board.  [Citations.]'  [Citation.]"  (*Hillhaven Oakland Nursing*, *supra*, 41 Cal.App.4th at p. 855.)

*Disposition*

The judgment is affirmed.  Respondent shall recover its costs on appeal.

<u>NOT TO BE PUBLISHED.</u>

YEGAN, Acting P. J.

We concur:

PERREN, J.

TANGEMAN, J.

Matthew P. Guasco, Judge

Superior Court County of Ventura

_____

    Law Offices of Samuel Franklin Galici and Samuel Franklin Galici for Plaintiff and Appellant.

    Sheppard, Mullin, Richter & Hampton; Richard J. Simmons, Daniel J. McQueen, Tyler J. Johnson and Keahn N. Morris for Defendant and Respondent.